**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN (COLUMBUS) DIVISION**

Michael Alf,
Gary Till,
Chris Armstrong,
Allan Novakowski, and
John Does 93 - 101,
individually and
on behalf of all others similarly situated,

Plaintiffs,

vs.

The Ohio State University,

Defendant.

Civil Case[1]:

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

---

[1] This case is related to Cases No. 2:18-cv-00692-MHW-EPD, 19-cv-2462-MHW-EPD, 20-cv-3817-MHW-EPD, 19-cv-4746-MHW-EPD, and 18-cv-736-MHW-EPD.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 7

PARTIES .............................................................................................................................. 8

FACTUAL ALLEGATIONS COMMON TO ALL COUNTS ........................................... 10

    I.    OSU Employed a Serial Sexual Predator As Its Sports Team Doctor and Student Health Services Physician and, By Doing Nothing When On Notice About It, Actually Enabled and Empowered the Sexual Predator .............................................................................................................................. 10

        A.    OSU Fostered a Sexually Hostile Environment in Larkins Hall Locker Room and Showers in Which Strauss Thrived ................................................................................................................. 12

        B.    OSU Required Sports Physicals During Which Strauss Abused Student Athletes ..................... 13

        C.    Abuse Not Confined to Annual Physicals – Team Doctor's Treatment for the Common Cold Required Student Athletes to Drop Their Shorts ................................................................................ 15

        D.    OSU Gave Strauss Broader Access to the General Student Population by Employing Him at the Campus Health Clinic ...................................................................................................................... 16

        E.    Even Students Volunteering to Assist with OSU's Medical Research Studies Become Victims 16

    II.    Timeline of OSU's Deliberate Indifference to Sexual Abuse of its Students By Its Sports Doctor and Clinic Physician ...................................................................................................................... 17

        A.    Late 1970s .................................................................................................................... 17

        B.    1980s ........................................................................................................................... 18

        C.    1990s ........................................................................................................................... 19

        D.    OSU's Continuing Culture of Indifference ................................................................. 29

    III.    The OSU of Today Disparages the OSU that enabled Strauss and Proclaims Its Naiveté to his Assault on the Student Body During his 20-year Tenure. ...................................................................... 34

        A.    2018: Public Outcry Compels OSU to Retain Perkins Coie to Investigate Itself ..................... 34

        B.    2019: Perkins Coie Report Released -- Plaintiffs Discover OSU's Deliberate Indifference to the Sexual Assaults by OSU's Predator Physician ....................................................................... 37

        C.    Following the Release of the Perkins Coie Report, OSU Finally Acts – But Only to Protect Its Brand, Control Public Relations, and Silence Survivors .................................................................. 45

        D.    Today: The Undisputed Facts Reveal That OSU Institutionally Protected and Emboldened Strauss, Yet it Continues to Unnecessarily Drag his Victims Through the Mud. ........................................... 48

        E.    OSU Employees and Physicians who Refused to Participate in Perkins Coie's Investigation Testify About the Extensive Institutional Cover-up for Strauss. .............................................................. 51

CLASS ACTION ALLEGATIONS ..................................................................................... 60

CLAIM FOR RELIEF ......................................................................................................... 63

Violation of Title IX, 20 U.S.C. § 1681, *et seq.* ................................................................ 63

PRAYER FOR RELIEF ....................................................................................................... 69

## <u>INTRODUCTION</u>

1.      The Ohio State University is a preeminent undergraduate and graduate research university and a perennial athletic powerhouse.

2.      As detailed in this Complaint, the men herein, like all members of the class, came to OSU as starry-eyed teens to get an education, have a college experience, or to be Division 1 athletes, and were—as part of the OSU experience—subjected to the worst serial sexual predator in American college sports history.

3.      When each of these innocent young male students encountered Dr. Strauss—OSU's associate professor of medicine, official team doctor for as many as fourteen sports, student health center physician, and eventually professor emeritus—they encountered a demented physician who subjected them to prolonged, repeated, disturbing, inappropriate, and criminal sexual abuse under the guise of "examination" or "treatment."

4.      What these students didn't know when they arrived in Columbus – and what they would not discover until the 2018 announcement of OSU's investigation (at the earliest) or fully realize until May, 2019, when Perkins Coie issued its Report—was that other doctors, program directors, head coaches, trainers, and officials across the OSU campus were aware of student complaints about Strauss but that OSU—over the course of decades—ignored, rebuffed, discouraged, dismissed, concealed and silenced these complaints.

5.      What these male students didn't know – at the time Strauss abused them, or at any time until the 2019 Perkins Coie report came out – was that rather than respond immediately and appropriately to the first report of abuse (which occurred in 1979, Strauss's first year on the job) OSU as an institution deliberately turned a blind eye to sexual harassment, abuse, and misconduct by Strauss for the next twenty years; it had no policies in place for handling or

responding to reports of sexual abuse or harassment, it failed to alert authorities, it failed to

discipline, fire, revoke or suspend Strauss's privileges, it failed to report him to the medical board

or to law enforcement, and, as testimony reveals, it kept Strauss's colleagues and supervisors in the

dark about how dangerous Strauss was to the student body.

6.     Dr. Ted Grace, Director of OSU Student Health Services [1992-2007], handled

three different complaints from students in 1995 and 1996 about Strauss sexually assaulting them,

yet never fully revealed this information with his colleagues or subordinates:

> Q: "Is there any way any Ohio State student could have known that
> their university failed on the job for 20 years to get rid of this sexual
> predator?"
> MR. CARPENTER: Object to the form of the question.
> A: "I don't know of any way."[2]
> **-Dr. Ted Grace, former Director of OSU Student Health Services**

7.     Dr. Roger Miller,  Chief of Preventative Medicine, OSU Student Health Services

[1994-1996] and Lead Physician, OSU Student Health Services [1996-1997], worked side-by-side

with Grace, but testified that the first time even he knew about the extent and number of reports

made to Grace at Student Heath about Strauss was when he read the Perkins report in 2019:

> Q: "Reading Perkins Coie you came to learn that Dr. Strauss started
> abusing patients in the late 1970s; correct?"
> A: "Yes."
> Q: "That's not information you knew before; right?"
> A: "That's correct."
> …
> Q: "And is there any way OSU -- any OSU student could have known
> that Dr. Strauss was a sexual predator against students for over 20 --
> for approximately 20 years before OSU got rid of him?"
> A: "I don't believe they would have known."[3]
> **–Dr. Roger Miller, former Chief of Preventative Medicine, OSU**
> **Student Health and former Lead Physician, OSU Student Health**

---

[2] Grace Dep. 307: 10-15. Nov. 20, 2019.

[3] Miller Dep. 314: 4-17, Nov. 12, 2019.

8.     In 1994, Dr. John Lombardo, Director of OSU Sports Medicine [1990-2004], investigated what he characterized as "pervasive" "rumors which have been generated for 10 years with no foundation" by speaking with Dr. Strauss, who acknowledged the rumors, and with Coach Charlotte Remenyik, the OSU fencing coach who'd fielded many reports from her athletes. Lombardo determined that Dr. Trent Sickles would treat the fencers, rather than Dr. Strauss. He testified that he told no one, and knew of no obligation or procedure to do so.

> Q.: "When you worked at OSU, if you yourself witnessed sexual abuse of a patient by a doctor, did you understand that you had any reporting obligations to anybody?"
> A.: "No. . . ."
> **–Dr. John Lombardo, former Director of OSU Sports Medicine**

9.     Dr. Trent Sickles, Medical Director, OSU Sports Medicine and Family Health [1995-2004], testified that his supervisors failed to inform him of any student complaints against Strauss and never told him why he replaced Strauss as the fencing team doctor:

> Q: "No one in the University gave you the slightest inkling that the administration knew about it and did nothing about it?"
> A: "That's correct."
> …
> Q: "And if you didn't know about it, there's no way that any student at Ohio State would have the slightest idea that there was a sexual predator at Ohio State, correct?
> A: "I -- I don't know what the students would have known."
> …
> Q: "Well, you didn't know?"
> A: "I did not know." [4]
> **-Dr. Trent Sickles, former Medical Director, OSU Sports Medicine and Family Health**

---

[4] Sickles Dep. 142: 25, 143: 1-15. Nov. 21, 2019

10. It wasn't until May of 2019—more than twenty (20) years after Strauss left OSU, more than a decade after Strauss took his own life, and more than a year after a whistleblower came forward to publicly disclose his abuse, awakening other survivors to admit they too had been victimized not only by Strauss but by OSU—that the men bringing this lawsuit on behalf of a class of an untold number of other victims, discovered OSU's widespread, institutional deliberate indifference to Strauss's dangerous proclivities, which left them vulnerable and susceptible to sexual assault.

11. The far-ranging, 232-page Report[5] released by OSU's hired-gun investigators, law firm Perkins Coie (the "Perkins Report"), confirmed: (a) that as far back as 1979, during Strauss's first year of employment at OSU, multiple OSU officials knew he was sexually assaulting male students, and (b) the abuse of all Plaintiffs herein could have been prevented if OSU had promptly taken appropriate action against Strauss.

12. In late 2019, as part of this litigation, OSU physicians who had refused to participate in the Perkins Coie investigation were deposed. One after another, these doctors, who had worked alongside Strauss in various OSU departments at different times, testified under oath about the many ways in which OSU excused, dismissed, and shielded Strauss's misconduct from OSU students, the public and law enforcement officials, and how its failures directly resulted in Strauss continuing to sexually harass, abuse, and sodomize hundreds, if not thousands, of OSU students under the guise of his position.

13. Rather than stop Strauss upon hearing the first report of an inappropriate exam,

---

[5] See Funk, Markus and Caryn Trombino, Perkins Coie LLP, *Report of the Independent Investigation, Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, May 15, 2019, (hereinafter "Perkins Coie Report").

OSU continued to employ—or, more accurately, enable—a prolific sexual predator for twenty more years and encouraged or required its students and student-athletes to obtain medical treatment from him while ignoring or concealing reports about his abuses, and then gilded his legacy with emeritus status and kept quiet about its role for another twenty years.

14.     In discussing the importance of the Perkins Report to determine what OSU knew and when, OSU President Michael Drake proclaimed in February 2019 that, "[u]pon completion of the investigation, the university will address the past and continue to take action to support a better and safer future."

15.     Plaintiffs and survivors are now asking OSU to make good on that promise.

16.     As a result of OSU's deliberate indifference, failures, and cover-up, which began in 1978 and were uncovered only in 2019, Richard Strauss preyed on the OSU male student body from 1979-1996. The men named herein and the class of OSU's male students they represent were:

    a.     Repeatedly rectally raped.

    b.     Drugged and sodomized.

    c.     Fellated.

    d.     Digitally penetrated with ungloved fingers into their anuses.

    e.     Fondled during required physicals.

    f.     Repeatedly subjected to Strauss grinding his erect penis into them.

    g.     Manually masturbated by Strauss, including students who were physically incapacitated.

    h.     Repeatedly psychologically tormented by Strauss showering with them, gawking

at them, commenting on their penis size and physical appearance and masturbating in their presence.

17.     The unchecked sexual abuse of these many men, as young, teenage college students by a university doctor is so horrifying, it shocks the conscience.

18.     Dr. Richard Strauss is dead. He can't pay for his crimes.

19.     OSU, recently unmasked as the institution that shielded this predator and betrayed so many students for so many decades, steadfastly hides behind the statute of limitations—as if OSU's refusal to do the right thing for long enough should wash away its sins.

20.     For at least **forty years**—from 1978 until it undertook an investigation in 2018—the University was deliberately indifferent to the safety of its student body by failing to investigate the many complaints of Dr. Strauss's misconduct and harassment, failing to share reports, failing to report to the State Medical Board or to law enforcement, or to restrict or remove Strauss from his position. Had it met its obligation to do so—an obligation that is not only social and moral, but also legal—the assault, molestation, and suffering of the Plaintiffs herein would have been prevented.

21.     Dr. Strauss was employed by Defendant Ohio State University to provide medical care and treatment to OSU's students and student-athletes for twenty years. OSU made him an assistant professor of medicine and the official sports team doctor. OSU also employed Dr. Strauss to serve as a physician at OSU's Student Health Services.

22.     As a sports team doctor and assistant professor, Dr. Strauss was clothed in the authority and legitimacy of Ohio State. He was not just a medical doctor—he was Ohio State's official medical doctor.

23.     Dr. Strauss used his position of trust and confidence to regularly and systematically sexually assault, abuse, batter, molest, and harass male students, student-athletes, non-

students as young as 14 invited onto the campus, non-students on OSU sponsored trips off-campus to high schools throughout Ohio, and others over the course of his career in his capacity as an employee, agent, and/or representative of OSU.

24.     Without OSU's imprimatur, Strauss would not have had access to the OSU male students upon whom he preyed.

25.     Despite being repeatedly informed of Dr. Strauss's sexual assault, abuse, battery, molestation, and/or harassment, OSU failed to take appropriate action (or, in fact, any action whatsoever) to prevent, limit, or stop Dr. Strauss, to change the sexually hostile culture on campus, or to ensure the safety of its male students.

26.     These failures have continued. In the twenty years since Dr. Strauss's tenure at OSU ended, OSU has taken no action to change the culture of indifference that allowed Dr. Strauss to assault OSU students for decades.

27.     With this suit, Plaintiffs seek to hold OSU accountable for its failures, and to ensure that something like this can never happen again.

## JURISDICTION AND VENUE

28.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

29.     This action is brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, as more fully set forth herein.

30.     This Court has subject matter jurisdiction over this action under numerous statutes, including 28 U.S.C. § 1331 (federal question jurisdiction).

31.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events

giving rise to Plaintiffs' claims arose in this judicial district.

## **PARTIES**

32.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

33.     Plaintiffs have one common characteristic—every Plaintiff herein is a former OSU student or student-athlete whose life was permanently altered and whose educational benefits were denied by the actions, inactions, and deliberate indifference of OSU.

34.     Every Plaintiff herein was sodomized or molested or penetrated or assaulted or groped or subjected to voyeurism or lewd comments by OSU's Dr. Richard Strauss, and this abuse could have been prevented had OSU timely acted on reports or notice of prior abuse.

35.     Plaintiff Michael Alf is a resident of the State of Illinois and a former student-athlete on OSU's wrestling team. Michael was sexually assaulted, battered, and molested by Dr. Strauss during examinations between 1988 and 1992.

36.     Plaintiff Gary Till is a resident of the State of Ohio and a former student at OSU. Gary was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the 1980s.

37.     Plaintiff Chris Armstrong is a resident of the State of California and a former student at OSU.  Chris was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the 1980s.

38.     Plaintiff Allan Novakowski is a resident of British Columbia, Canada, and a former student-athlete on OSU's ice hockey team. Allan was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations while attending OSU.

39.     Plaintiff John Doe 93 is a resident of the State of Oregon and a former student-

athlete on OSU's lacrosse team. John Doe 93 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the 1980s.

40.     Plaintiff John Doe 94 is a resident of the State of California and a former student at OSU. John Doe 94 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations while attending OSU.

41.     Plaintiff John Doe 95 is a resident of the State of Oregon and a former student at OSU. John Doe 95 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the late 1980s and early 1990s.

42.     Plaintiff John Doe 96 is a resident of Ohio and a former student-athlete at OSU / on OSU's baseball team. John Doe 96 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the 1990s.

43.     Plaintiff John Doe 97 is a resident of Arizona and a former student-athlete on OSU's gymnastics team. John Doe 97 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations while attending OSU.

44.     Plaintiff John Doe 98 is a resident of Ohio and a former student-athlete on OSU's lacrosse team. John Doe 98 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the 1980s.

45.     Plaintiff John Doe 99 is a resident of Ohio and a former student-athlete on OSU's lacrosse team. John Doe 99 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations while attending OSU.

46.     Plaintiff John Doe 100 is a former student-athlete at OSU. He was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

47.     Plaintiff John Doe 101 is a former student-athlete at OSU. He was sexually

assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

48.     On information and belief, there are multiple other survivors of Strauss's abuse, otherwise class members, who desire to participate as class representatives and who are similarly situated to those named herein.

49.     Defendant The Ohio State University is the biggest and richest University in the Big Ten Conference with an annual budget of $7 billion managed by the Board of Trustees composed of some of the largest and most powerful businesses in Ohio.

50.     Defendant The Ohio State University ("OSU" or "Ohio State") is and at all relevant times has been a state-owned and operated public university and institution of higher education organized and existing under laws of the State of Ohio. OSU receives federal financial assistance and is therefore subject to Title IX, 20 U.S.C. § 1681, *et seq.*

51.     At all times relevant hereto, Richard Strauss, M.D. was an actual and/or apparent, duly authorized agent, servant and/or employee of OSU and performed medical services for OSU student-patients and members of the university community as part of his employment.

52.     At all times relevant hereto, Defendant Ohio State was complicit and deliberately indifferent to the sexual assault and harassing conduct of Dr. Strauss.

53.     At all times relevant hereto, Defendant Ohio State was complicit and deliberately indifferent to reports it received regarding Dr. Strauss's sexually harassing conduct.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**I.      OSU Employed a Serial Sexual Predator As Its Sports Team Doctor and Student Health Services Physician and, By Doing Nothing When On Notice About It, Actually Enabled and Empowered the Sexual Predator**

54.     Ohio State hired Dr. Strauss in 1978 as an assistant professor of medicine.

55.     OSU did nothing to ensure that Dr. Strauss was not a sexual predator and

established no safeguards for students if he was.

56.     Indeed, OSU never took action to protect students, rather at every opportunity, OSU protected and enabled predator Strauss.

57.     Dr. Strauss was a prolific sexual predator—he is estimated to have sexually assaulted, abused, battered, molested, and/or harassed up to 3,000 male student athletes and others during his 20-year tenure at OSU.[6]

58.     This abuse began his very first year of employment at OSU, and he continued sodomizing, fondling, groping, sexually assaulting, and harassing OSU's male students and student-athletes until he was allowed to retire in 1998. He did so with OSU's knowledge and support—and even earned emeritus status.

59.     The Perkins Report confirmed, "University personnel had knowledge of Strauss' sexually abusive treatment of male student-patients as early as 1979".[7]

60.     As highlighted by the Report and the stories that the survivors are now telling, OSU knew or should have known from the beginning that Strauss was a sexual predator.

61.     Over the forty years since OSU hired Strauss, OSU played a key and active role in normalizing and perpetuating Dr. Strauss's serial sexual abuse.

62.     OSU facilitated his abuse by requiring that student-athletes undergo annual physical exams with Dr. Strauss in order to participate in OSU athletics and maintain their scholarships.

63.     His notoriously hands-on examinations earned him different nicknames over the

---

[6] This is based on men's sports team lettermen rosters from 1978-1998, which do not even encompass all athletes who would have been exposed to Dr. Strauss, and the additional student victims at the University Hospital, Student Health Center, and off-campus Men's Clinic.

[7] *Perkins Coie Report of the Independent Investigation*, p. 1.

years, including "Dr. Jelly Paws," "Dr. Drop-Your-Drawers," "Dr. Nuts," and "Dr. Cough."

64.    These were nicknames well-known by OSU coaching staff, trainers, and student athletes.

### A. OSU Fostered a Sexually Hostile Environment in Larkins Hall Locker Room and Showers in Which Strauss Thrived

65.    Throughout the 80s and 90s, Dr. Strauss was a fixture in the locker rooms, showers, and saunas of Larkins Hall.

66.    Dr. Strauss thrived at Larkins Hall. Like many sexual predators, once he selected his prey, he took steps to groom them for abuse.

67.    Dr. Strauss would shower with athletes after workouts at the Larkins facility, and had his locker in the students' locker room.

68.    Dr. Strauss generally showered multiple times daily—a shower with each team—where he would wash himself while staring at the showering athletes.

69.    On many occasions, Dr. Strauss would postpone performing medical treatments after practice so that he could shower with the wrestling team.

70.    Dr. Strauss also scheduled his showers so that he could view his favorite athletes naked.

71.    In one instance, Dr. Strauss had just finished showering, had dressed, and was leaving the locker room. As Dr. Strauss was exiting the locker room, one of his favorite wrestlers entered and prepared to shower. Dr. Strauss immediately undid his tie, returned to his locker, undressed, and joined the athlete in the shower, his second shower in a matter of minutes.

72.    Dr. Strauss once moved his locker to be next to the locker of one of his favorite wrestlers, who, accordingly to another former wrestler, looked like an "Abercrombie & Fitch model."

73.      One victim recounted the extreme emotional and psychological toll that he experienced as a result of seeing Strauss in the showers and locker room every day. He recalled how mentally taxing it was to constantly witness an authority figure nude, gawking at the students and masturbating, and how it would wear on him daily to know that Strauss was waiting every day in the locker room after practice.

74.      Strauss's steadfast presence in the student-athlete showers was known and acknowledged by many OSU employees who could have taken steps to stop it, but didn't.

75.      Ohio State demolished Larkins Hall in 2005, the same year Dr. Strauss took his own life.

### B.  OSU Required Sports Physicals During Which Strauss Abused Student Athletes

76.      Dr. Strauss took his harassment a step further behind the closed door of his on-campus examination room.

77.      Ohio State required student athletes to undergo physical examinations by Dr. Strauss at least once per season, and sometimes more often.

78.      During these required examinations, Dr. Strauss forced male student athletes to undress from the waist down and submit to invasive and medically unnecessary examinations, during which he would touch and fondle their genitalia and digitally penetrate their anuses, often telling the athletes that he was checking for hernias.

79.      There was no medical necessity for Dr. Strauss's examination, touching, and fondling of male student athletes' genitalia or digital anal penetration during the required periodic physical examinations—Dr. Strauss did it for his own personal, sexual gratification.

80.      This behavior persisted throughout Strauss's entire tenure at OSU.

81.      One former athlete described the first time he was examined by Dr. Strauss: "I'm

sitting, and he straddled my thigh, mounted my thigh. Rubbed on my thigh. I was just frozen," the

athlete said.

82.    Dr. Strauss then asked the athlete to get naked so Dr. Strauss could check for a

sports hernia. The athlete said Strauss proceeded to "inspect my penis in detail" for a significant

amount of time.

83.    Dr. Strauss gave the athlete a physical again the next year. It lasted about 20

minutes, 15 minutes of which involved Dr. Strauss closely inspecting his genitalia.

84.    The athlete remembers being concerned at the time, but alarms were raised the

next year when another doctor gave the athlete a physical. It lasted only five minutes.

85.    The athlete recalls thinking at the time, "No hernia test, didn't get naked. Is that

it?"

"Then I was like, 'Holy moly,'" the athlete said.

"I was always afraid. [Strauss] was the leading doctor on steroid use in the world, and I
was always like, he could always say that medically there's some reason that he needs to
spend 15 minutes on my penis," the athlete said. "He could have said that, and he's dead
now, but that's what always scared me. But now I'm like, that's crazy. Especially when
that other doctor came in in five minutes and checked me out."

86.    As the former athlete explained, he felt powerless to stop Strauss's abuse:

"Someone had to make that decision [to let Strauss continue conducting physicals]," the
athlete said. "Let's say he's a great doctor, fine. He doesn't have to do the physicals,
because it's like someone was pretty much feeding us to him. I didn't have a choice to say,
'I want somebody else to do my physical' because I didn't feel like I had any power in that
position."

87.    Indeed, Ohio State fed its students and student-athletes to Dr. Strauss; these

students were particularly vulnerable to abuse.

88.    Many of the student-athletes depended on athletic scholarships to attend Ohio

State, scholarships which were contingent on playing by the school's rules, including the

requirement to undergo physical examinations by Dr. Strauss.

89.     One athlete asked if he could get his mandatory yearly physical exam elsewhere but was told he had to see Dr. Strauss. These were the longest exams he had ever experienced, and always included a "hernia check."

C.  *Abuse Not Confined to Annual Physicals – Team Doctor's Treatment for the Common Cold Required Student Athletes to Drop Their Shorts*

90.     But Dr. Strauss did not confine his abuse to the periodic physical examinations required by Ohio State.

91.     Ohio State allowed Dr. Strauss to treat student-athletes for sports injuries and everything else—from heartburn to sprained ankles.

92.     Regardless of the ailment, Dr. Strauss's treatment of male student athletes almost always included examination, touching, and fondling of their genitalia, and it frequently included digital anal penetration.

93.     A former OSU gymnast specifically recalls any time he saw Strauss for a medical issue, whether it was an annual physical, a broken bone, or an ear infection, he was required to disrobe and endure an extended and uncomfortable examination of his lower body.

94.     A former wrestler recalls Dr. Strauss approaching him in Larkins Hall and suggesting that, if he would come to the health center, Dr. Strauss could write him a prescription for acne. When he did so, Dr. Strauss had him disrobe and lay down on the examination table. Dr. Strauss inspected and fondled the athlete for five minutes, trying to bring him to an erection. When he was unsuccessful, he wrote the prescription for acne medication and the student left.

95.     Some athletes saw it as the price of getting treatment.

96.     Ohio State forced student athletes to make a chilling decision: either seek treatment from Dr. Strauss and submit to his molestation or forego treatment and live with illness

or injury.

97.     Athletes had to receive physicals before competing, whether or not they were injured, which meant that systematic sexual abuse from Dr. Strauss was inevitable under the Devil's bargain Ohio State forced them to make with themselves.

98.     With their collegiate athletic careers and scholarships on the line, many athletes sought treatment from Dr. Strauss for their physical conditions, at a high cost to their mental and emotional health.

D. *OSU Gave Strauss Broader Access to the General Student Population by Employing Him at the Campus Health Clinic*

99.     OSU also permitted Dr. Strauss to treat nonathletes at OSU's Student Health Services campus health clinic until complaints led OSU to relegate Dr. Strauss to serving only its athletic teams.

100.    According to a nurse interviewed by Perkins Coie, 1990-1992 OSU student health director Dr. Forrest Smith had notice about Strauss and received reports that Strauss would "show up to the Student Health Center with male students and request access to an examination room" without adhering to "normal scheduling protocols and recordkeeping."   But Smith did nothing.

E. *Even Students Volunteering to Assist with OSU's Medical Research Studies Become Victims*

101.    Even students who weren't seeking medical care were victimized. Strauss, along with OSU-tenured Department of Medicine physician Dr. William Malarkey (still a fixture at OSU's Wexner Medical Center) conducted various research studies on students, whom Strauss victimized during the "research."

102.    A student-athlete who participated in a research study with Dr. Strauss told Perkins Coie that Strauss would conduct a hernia exam on an "almost daily" basis as part of his

participation in the study.

103.     The only witness to this abuse, Dr. Malarkey, refused to cooperate with Perkins Coie.

104.     When asked under oath what he was told about Dr. Strauss by other OSU officials, Dr. Malarkey claimed he knew nothing about Strauss prior to the time they co-authored these studies and was never alerted to the fact that OSU investigated three complaints of sexual misconduct against Strauss in the 1990s, or that Strauss was eventually placed on administrative leave.

## II.     Timeline of OSU's Deliberate Indifference to Sexual Abuse of its Students By Its Sports Doctor and Clinic Physician

### A.  Late 1970s

105.     From 1978 to 1998, Strauss was the University's team doctor and had contact with male athletes in baseball, cheerleading, cross country, fencing, football, gymnastics, ice hockey, lacrosse, soccer, swimming, tennis, track, volleyball, wrestling, and others. He was also a part-time physician with OSU's Student Health Services.

106.     In 1978—Dr. Strauss's first year at Ohio State—Dr. Strauss fondled a former wrestling team captain during an exam. The wrestler left the exam and went to the Ohio State student health center where he complained about Dr. Strauss's fondling to another doctor.

107.     The doctor told the wrestler that the exam he described was "not normal." But the doctor did nothing. Ohio State did nothing.

108.     In 1979, a student trainer reported that OSU personnel in the Athletics Department and Sports Medicine program were aware that Strauss was conducting genital examinations on male athletes that were unusually prolonged, and that Strauss refused to allow athletic training

staff to be present for these protracted genital examinations.[8]

B. *1980s*

109.    In 1982, OSU's Student Health Center Sports Medicine Clinic Director David Henderson drafted report criticizing the care being administered to student-athletes, stating "Strauss works for no one, answers to no one, and is accountable to no one" and concluding that patient visits had decreased 21% in Strauss's first year. This report was given to Dr. Bob Murphy, the head team physician and Director of Sports Medicine.[9]

110.    In 1983, OSU Fencing Coach Charlotte Remenyik first received reports regarding Strauss when a fencer sought treatment for a foot injury and was forced to "drop his pants."[10]

111.    In 1984, Remenyik said that she received reports from fencers that Strauss was watching them take showers.[11]

112.    In 1988, Student R and a teammate were questioned by trainer Bill Davis about Strauss's exams in detail. Student R remembered Davis being concerned and thought Strauss would be fired or removed, but nothing ever happened.[12]

113.    Also in 1988, an Assistant Coach corroborated that Student R reported to him about Strauss and he met with Davis, the team's athletic trainer, as well as the team's head coach to discuss the report. Davis and the head coach decided that Strauss would never see an athlete without a trainer present.[13]

---

[8] *Id. at* 2.

[9]  *Id. at* 116.

[10] *Governor's Working Group on Reviewing the Medical Board's Handling of the Investigation Involving Richard Strauss* at 50.

[11] *Id.*

[12] *Id*. at 104.

[13] *Id.* at 105.

114.    In 1989, another Team Physician recalled that he witnessed a student emerge from an exam and announce to the training room that Strauss had inappropriately examined his genitals. The team physician recalled speaking to the athletic trainer and the trainer reporting this information to Bob Murphy (head team physician) to be investigated.[14]

115.    From the late 1980s to early 1990s, Assistant Athletic Director Larry Romanoff reported Strauss showering with the students to Bob Murphy (head team physician)[15] but the daily showers continued.

*C.  1990s*

116.    In 1991, a Graduate Assistant Trainer reported to Dr. John Lombardo (head team physician) concerns about the rumors regarding Strauss's seemingly unnecessary genital exams and the fact that Strauss insisted on one-on-one exams with the students.[16]

117.    In the early 1990s, Student N personally spoke to Athletic Director Jim Jones and Assistant AD Kate Riffee about the environment for student athletes and Strauss and why Strauss had a locker at Larkins Hall. Student N recalls A.D. Jones being dismissive.[17]

118.    Because his thesis centered around student-athletes and the pressures they faced, this student presented his thesis to Jones and Riffee in conjunction with his inquiries about Strauss. He asked why Strauss had a locker in Larkins Hall, which was designated for student-athletes.[18]

119.    He remembers Jones being dismissive and not interested to the line of questioning,

---

[14] *Id.* at 101.

[15] *Id.* at 100.

[16] *Id.* at 102.

[17] *Id.* at 90.

[18] *Id.*

instructing the student to "move on."[19]

120.    Assistant AD Kate Riffee recalled it being "a topic of conversation" among staff members in Athletics that Strauss took long showers at Larkins with students.[20]

121.    In 1993, one wrestler recalls being at one of his earliest practices with the team, where he was told that a physical would be required and was directed to Dr. Strauss. He was warned by upperclassmen who joked, "watch out - he's going to play with you." At the physical, Dr. Strauss engaged in fondling and close inspection of his genitals for an extended amount of time.

122.    In 1993, another former OSU wrestler complained about Dr. Strauss to former head wrestling coach Russ Hellickson after being groped during three exams. The wrestler said that Coach Hellickson told Dr. Strauss to stop such behavior.

123.    Coach Hellickson told Dr. Strauss that some of the athletes were "uncomfortable" with him showering with them, to which the doctor responded that Hellickson also showered with the athletes. Hellickson responded: "Not for an hour, Doc."

124.    Coach Hellickson also complained to Dr. Strauss about touching his athletes: "I said 'When you're doing weigh-ins, you're too hands on, Doc,'" Hellickson said.

125.    In November 1994, Medical Director/Head Team Physician Dr. John Lombardo wrote to Associate Athletic Director Paul Krebs, addressing concerns raised by head fencing coach Remenyik about Strauss.

126.    Coach Remenyik had complained that Strauss was performing improper or unnecessary genital exams on the male fencers. Lombardo reported that the complaints (which he

---

[19] *Id.*

[20] *Id.* at 91.

referred to as "pervasive") were unfounded but that the male athletes were not comfortable with Strauss as their physician so Dr. Trent Sickles would be taking over as the fencing doctor.[21]

127.    OSU did not inform Dr. Sickles why he replaced Strauss as the fencing team doctor; OSU deliberately kept him in the dark

128.    Dr. Sickles testified that his supervisors, Dr. Murphy, followed by Dr. Lombardo, both failed to inform him of any complaints against Strauss or that Strauss made athletes uncomfortable by showering with them.[22]

129.    Despite having received six reports by students (at a minimum) about sexual impropriety exhibited by Dr. Strauss at the time he removed him as the fencing team physician, Lombardo withheld this information from Dr. Sickles.[23]

130.    Lombardo never followed up with Sickles to see if the fencers were ok with his treatment[24], never inquired with any other athletes to determine if Strauss was performing the same prolonged, overtly sexual exams on them or showering with them.[25]

131.    Needless to say, Lombardo never reported Strauss to police, a prosecutor, any type of authority or the Ohio State Medical Board[26] and Strauss continued to treat all the other athletes on teams to whom he was still assigned as their physician.

132.    Also in the fall of 1994, two wrestlers met with then-Athletic Director Andy Geiger ("AD Geiger") in his office. The wrestlers complained about the voyeuristic and lewd

---

[21] *Id. at* 94.

[22] Sickles Dep. 104: 6-25, 105: 1-25, 106: 9-14. Nov. 21, 2020.

[23] Sickles Dep. 106: 2-10. Nov. 21, 2020.

[24] Sickles Dep. 61: 9-23. Nov. 21, 2020.

[25] Lombardo Dep. 194: 20-22, 17: 7-10. Nov. 12, 2019.

[26] Lombardo Dep. 113: 2-13. Nov. 12, 2019.

conduct of the men in the lockers and saunas of Larkins Hall, the former student and faculty recreation center on the Ohio State campus that housed the wrestling, gymnastics, and swimming teams.

133. A former OSU wrestling coach described Larkins Hall as "a cesspool of deviancy," saying "Coaching my athletes in Larkins Hall was one of the most difficult things I ever did."[27]

134. Student athletes were regularly harassed in Larkins Hall by sexually aggressive men who attended the university or worked there:

> The voyeurs would masturbate while watching the wrestlers shower or sit in the sauna, or engage in sexual acts in the areas where the athletes trained, the former wrestlers said.
> …
> The situation was so egregious that former wrestling head coach Russ Hellickson would at times have to physically drag the gawkers out of the building, several sources familiar with his actions at the time said. Hellickson pleaded with the university multiple times to move their athletes to a private facility, the sources said….[28]

135. The wrestlers pleaded with the University administration to make changes to Larkins Hall to protect student athletes and specifically complained of Dr. Strauss's conduct. They presented AD Geiger with drawings of changes to the wrestling and gymnastics locker room that they believed would enhance safety and privacy for student athletes.

136. AD Geiger promised to look into doing something about the situation.

137. But Ohio State did nothing.

138. It did not move the athletes to a private facility, as Coach Hellickson requested.

---

[27] Rachael Bade and John Bresnahan, *'A cesspool of deviancy': New claims of voyeurism test Jordan denials*, POLITICO, (July 6, 2018), https://www.politico.com/story/2018/07/06/jim-jordan-harassment-ohio-state-wrestling-699192. (last visited July 16, 2018).

[28] *Id.*

139.    And it did not make the changes the wrestlers suggested.

140.    Only one thing changed: the locker room carpet was cleaned.

141.    The Perkins Report confirms that, in January 1995, "Coach A" acknowledged that he personally confronted Strauss about Strauss showering with students and told him he was too hands on. "Coach A" thought he adequately addressed these issues with Strauss.[29]

142.    Also in January 1995, two student-patients (Students A and B) from the Student Health Men's Clinic separately reported complaints about Strauss to Student Health administrators.[30]

143.    In January 1996, after Student C in the Perkins Report, reported being molested by Strauss to Dr. Ted Grace, Strauss was quietly placed on administrative leave from Student Health and Athletics.[31]

144.    Dr. Ted Grace was immediately alerted about this incident, the third student complaint about Strauss in just one year.

145.    Prior to the reports by Students A, B and C in 1995-1996, Dr. Grace was never alerted by Dr. Lombardo, Paul Krebs or anyone in the OSU athletics department about the numerous reports about Strauss they had received, or the pleas by Coach Remenyik in 1994 that Strauss be removed as the fencing physician.[32]

146.    Prior to coming to OSU, Dr. Grace admitted to hearing rumors and being warned by his previous boss at San Diego State about a "touchy feely doctor" at OSU[33]. And yet despite

---

[29] *Perkins Coie Report of the Independent Investigation*, p. 91.

[30] *Id*. at 114.

[31] *Id.*

[32] Grace Dep, 87:1-25, 88: 1-25, 89: 1-25, 90: 15-18. Nov. 20, 2019

[33] Grace Dep, 120: 12-16.  Nov. 20, 2019

these years-long warnings and three separate student complaints of blatant sexual abuse by Strauss, Grace still failed to alert others about the danger Strauss posed to his patients.

147.    **Shockingly, under oath, Grace stated that he did not regret failing to report Strauss to law enforcement.**[34]

148.    This absolute failure on the part of Dr. Ted Grace allowed Strauss to elude criminal investigation and prosecution, yet again, paving the way for him to continue to treat unsuspecting students at a new location.

149.    Although OSU relieved Strauss from his position at OSU's "Men's Clinic," it allowed Strauss to open and advertise to students and provide discounted sexual health services to students at his off-campus medical "Men's Clinic" for two more years, where countless additional students fell victim to his abuse.

150.    Over the spring and summer of 1996, Strauss scoured OSU's campus to recruit students to come work at the Men's Clinic, using his clout as a tenured-professor to lure male nursing students into believing this was a legitimate professional opportunity.

151.    Strauss conducted on-campus interviews in University buildings, where he boasted about his renowned career with OSU and used his status as a tenured professor to garner trust from potential job applicants.

152.    OSU stamped its approval on Strauss and the Men's Clinic by allowing the on-campus recruiting and hiring.

153.    Unbeknownst to the male nursing students Strauss was interviewing—or to any OSU students—OSU's Vice President of Student Affairs, in conjunction with OSU's general

---

[34] Grace Dep, 326: 8-10 Nov. 20, 2019 (Q: "Do you wish that you had reported Dr. Strauss to law enforcement?" A. "No.") (emphasis added)

counsel, convened a disciplinary hearing against Strauss in June 1996.

154.     In July 1996, the OSU Athletics Department terminated Strauss's employment agreement.

155.     On August 5, 1996, Strauss was informed that his appointment with OSU Student Health Services was also terminated.

156.     Also in August 1996, the State Medical Board of Ohio began its own investigation of sexual improprieties raised against Strauss.

157.     At no point in time during OSU's investigation or subsequent findings of credible reports of sexual assault of students did OSU ever report Strauss to law enforcement, ban him from campus, or prevent him from interacting with students.

158.     Nevertheless, in August 1996, Dr. Strauss set up shop in a nondescript, three-story office building less than two miles from campus. There, he opened "Men's Clinics of America," a men's health clinic that offered "Prompt Treatment of Common Genital/Urinary Problems."

159.     By September 1996, within a few weeks of Strauss's removal as an OSU physician, his Men's Clinic was up and running, targeted to vulnerable male OSU students, who were suffering from sexually transmitted diseases or urological issues, offering them low-cost or free health care.

160.     Despite the name, Men's Clinics of America was only one clinic, and it had only one doctor—Richard Strauss.

161.     Not only did OSU know Strauss was running the clinic in such close proximity of campus and treating unsuspecting students, but the University gave him its blessing to open the facility.

162.     At least a month before Men's Clinic of America was up and running, "in mid-

July 1996, Strauss received assurances from the Associate Vice President of Health Sciences and Academic Affairs that there would be no issue with Strauss engaging in part-time private medical practice while retaining his tenured faculty position at the University. The Associate Vice President was aware, at the time he provided these assurances to Strauss, that Strauss was being investigated by Student Affairs following a complaint brought against Strauss by a student-patient."[35]

163.    Using his name and status as a University-sanctioned tenured professor, Strauss targeted students through his ads in the OSU paper, The Lantern.

164.    Students who sought treatment at Men's Clinic of America likely were not even aware that it wasn't the same OSU sponsored Men's Clinic where they had previously gotten treatment from Strauss.

165.    OSU made no effort to warn students about the dangers of being treated by Strauss or to prevent Strauss from seeking patients who were OSU students.

166.    Instead, OSU allowed Dr. Strauss to solicit its male students for sexual health treatment in its student newspaper.

167.    In fact, in November 1996, OSU's Student Health Director learned that Strauss was operating Men's Clinic of America right near campus, and reported this to the Ohio Medical Board, yet the ads continued to run in the Lantern for at least another 4 months.

---

[35] *Id*. at 5.



168.

An advertisement that ran in The Lantern on multiple occasions during the Fall 1996 semester.

169.    OSU would have discovered all of this had it vetted the ad in its campus paper from unnamed "experienced doctors" offering discounted sexual health services to its students. But OSU didn't do that.

170.    OSU was oblivious or willfully blind to these red flags—a doctor removed from his position in light of complaints of sexual abuse against him, opening his own clinic to treat "common genital/urinary problems."

171.    Unsuspecting male students had no way of knowing that this clinic was not under OSU's supervision and Strauss operated under the auspice that he was still a University physician, simply functioning in a new location.

172.    OSU took no steps to protect its students or members of the community, naïve to Strauss's employment status with the University, and naïve to Strauss's dangerous propensities. OSU left them vulnerable for sexual abuse because of its failure to publicly admonish or disassociate with Strauss, despite the multiple, credible reports of sexual abuse of patients.

173.    At the clinic, OSU athletes were given priority and seen on a walk-in (unscheduled) basis. For OSU athletes, there were no intake charts completed per Dr. Strauss's request, and while Dr. Strauss saw other patients with the office staff, he saw OSU athletes alone.

174.    Indeed, OSU took no legal or disciplinary action against Dr. Strauss as a result of the summer 1996 hearing. Although Strauss was relieved of his responsibilities as a physician at Student Health Services, his status as a tenured faculty member in the University's School of Public Health remained unchanged.

175.    Further, the School of Public Health never initiated or otherwise pursued its own investigation of Strauss.

176.    Dr. Strauss quietly retired from his positions at OSU in March of 1998.

177.    In a memo announcing his retirement in 1998, OSU officials proclaimed, "Dr. Strauss has become a national and international renowned expert in the field of sports medicine through his outstanding teaching, service and research."

178.    Upon his retirement, OSU gilded Strauss's reputation with the title of Emeritus Professor.

179.    Dr. William Malarkey, who co-authored research studies with Strauss, testified about the honor of receiving emeritus status, that it was not given to all, and that it carried certain privileges with the university, such as use of the OSU's library, access to OSU football season tickets, and the privilege of parking on campus.[36]

180.    All of these rights that accompanied the honor of being a professor emeritus gave Strauss clout and authority to OSU students. Unsuspecting students who hadn't interacted or yet been assaulted by Strauss would have no reason to be alarmed by his "retirement", as confirmed by Dr. Malarkey.[37]

181.    OSU's actions stand in stark contrast to the knowledge OSU harbored, that Strauss

---

[36] Malarkey Dep. 75:1-8, 76:11-25. Nov. 22, 2019.

[37] Malarkey Dep. 83: 11-21. Nov. 22, 2019.

had long been abusing male students.

182.     Then OSU Dean of College of Medicine and Public Health, Dr. Bernadine Healy, protested Strauss's emeritus appointment. When a department-wide memo was released announcing Strauss's "retirement" and emeritus appointment, Dean Healy denounced this decision writing that she had not approved this emeritus appointment and that she had not been told about the recommendation.

183.     OSU made the recommendation despite its knowledge that Strauss had perpetuated sexual abuse on thousands of innocent students.

184.     OSU's role in facilitating and covering up Strauss's abuse remained concealed for all these years, and its deliberate indifference has remained the status quo.

D. *OSU's Continuing Culture of Indifference*

185.     Unfortunately, OSU has fostered a culture of institutional indifference to the rights and safety of its students: Dr. Strauss is not the only OSU employee who has used his position to abuse students, although he may be the most prolific abuser.

186.     This continuing culture of indifference has been noted by the U.S. Department of Education's Office of Civil Rights, in multiple lawsuits against the University, and in the media.

187.     In June of 2010, the United States Department of Education's Office of Civil Rights ("OCR") began an investigation into OSU regarding its policies and procedures enacted to protect and respond to victims of sexual assault and abuse on campus.

188.     Only after the investigation began and OCR issued a 2011 Dear Colleague letter on sexual violence did OSU scramble to revise its sexual abuse policies and procedures.[38]

---

[38] *See* Letter from Meena Morey Chandra, Regional Director, Reg. XV, Office for Civil Rights, U.S. Dep't Educ., to Dr. Michael V. Drake, President, Ohio State University, 2 (Sept. 11, 2014) (describing results of OSU's investigation of alleged sexual harassment within Marching Band),

189.    To close the review, OSU entered into a resolution agreement with OCR.[39]

190.    After OCR initiated its investigation, OSU internally investigated a sexual harassment complaint against its marching band, which resulted in the dismissal of its director, Jonathan Waters, for fostering a "culture of intimidation." The investigation found that OSU had notice of the hostile environment but had failed to do anything about it.

191.    Upon completion of the overarching OCR investigation, which spanned more than four years, OCR made findings that OSU violated Title IX.

192.    OCR mandated *inter alia* that "Once a [Title IX] recipient knows or reasonably should know of possible sexual harassment, it must take immediate and appropriate action to investigate or otherwise determine what occurred."[40]

193.    In July of 2014, OSU President Michael Drake pledged "Nothing is more important than the safety of our students. We expect every member of our community to live up to a common standard of decency and mutual respect and to adhere to university policies."[41]

194.    Coincidentally, just days later, in August of 2014, during a diving meet, Ohio State received a report that OSU assistant diving coach Will Bohonyi was sexually abusing a minor member of OSU's Diving Club. Inexplicably, OSU allegedly sent the victim—not the perpetrator—home from the meet.

195.    OSU then failed to take action to address the hundreds of naked photographs of

---

https://www2.ed.gov/documents/press-releases/ohio-state-letter.pdf (last visited August 14, 2018) (hereinafter "OCR Findings Letter").

[39] Resolution Agreement, Ohio State University, OCR Docket #15-10-6002, accessible at https://www2.ed.gov/documents/press-releases/ohio-state-agreement.pdf (last visited July 24, 2018).

[40] Letter from Meena Morey Chandra, Regional Director, OCR, to Dr. Michael Drake, President of OSU (September 11, 2014)

[41] *Id.*

the underage victim engaged in sexual acts that Coach Bohonyi had forced her to take. These photographs—child pornography—have sat in OSU's possession for some four years.

196. Despite its pledge and resolution agreement in response to the 2010-2014 OCR investigation, OSU continued to foster a culture of indifference and has demonstrably failed to show it was working to protect survivors of sexual violence.

197. OSU has continued to respond inappropriately and unreasonably to reports of sexual violence.

198. This pattern of failing to protect students and allowing sexual assault to perpetuate and continue effectively remains today at OSU.

199. In May of 2018, the University announced it had conducted an independent review of its Sexual Civility and Empowerment unit ("SCE"), an on-campus entity enacted to support victims of sexual assault.[42]

200. The findings of this external review indicated that the SCE had failed to properly document and report pertinent information regarding sexual assault complaints made by students.[43]

201. The Ohio Health Sexual Assault Response Network of Central Ohio made deeply disturbing findings regarding the response by university employees at the SCE to victims of sexual abuse.[44]

202. Among the findings made were that "Survivors were subjected to victim-blaming,

---

[42] Zach Varda and Michael Lee, *Ohio State shuts down its Sexual Civility and Empowerment uni*t, The Lantern, June 19, 2018, https://www.thelantern.com/2018/06/ohio-state-shutting-down-sexual-civility-and-empowerment-unit/. (last visited August 29, 2018)

[43] *Id.*

[44] Jennifer Smola, *Ohio State closes sexual-assault center, fires 4 after complaints,* The Columbus Dispatch, June 19, 2018. http://www.dispatch.com/news/20180619/ohio-state-closes-sexual-assault-center-fires-4-after-complaints (last visited September 23, 2018)

unethical and re-traumatizing treatment by SCE advocates. Some victims were told they were lying or delusional, suffered from mental illness, had an active imagination, didn't understand their own experience or fabricated their story."

203. In a statement by the University following the findings made regarding SCE, OSU claimed it is working toward improvement: "Ohio State will do all that we can to be a national leader in preventing and responding to sexual misconduct," Ohio State University President Michael Drake said in a statement. "Our campuses must be safe places for all members of our community to learn, work and grow. We remain steadfastly and unwaveringly committed to this goal."[45]

204. But this statement is belied by OSU's conduct: Forty years after Richard Strauss began sexual assaulting students under the guise of practicing medicine, OSU has continued to fail to enact or implement meaningful change or programs to protect victims.

205. And in August 2018, the Office for Civil Rights announced it would *again* be launching an investigation into OSU's compliance with Title IX, to inquire whether the University responds promptly and equitably to complaints and reports of sexual misconduct by former students.[46]

206. Ohio State University's continued indifference and resulting inaction to sexual abuse allegations against Strauss is wanton, willful and with reckless disregard and neglect of Plaintiffs' rights, safety and wellbeing.

207. OSU has displayed and continues to display deliberate indifference to the

---

[45] *Id.*

[46] Dakin Andone, *Ohio State University faces federal investigation into alleged sexual misconduct by school doctor,* August 17, 2018, https://www.cnn.com/2018/08/17/us/ohio-state-university-federal-investigation/index.html (last visited October 25, 2018)

suffering of its students. It perpetuated a sexually hostile environment and a culture of deliberate indifference by ignoring widespread and repeated complaints of Dr. Strauss's conduct. Its pre-assault failures resulted in additional harm to Plaintiffs. Had OSU responded appropriately and reasonably to complaints, assault could have been avoided. Instead, it concealed and rebuffed reports, which prevented Plaintiffs from discovering their claims.

208.    OSU encouraged an attitude of deliberate indifference—sweeping away allegations of abuse, at best, and outright ignoring these allegations at worst—all in the name of protecting the University's supposed integrity and coaxing more and more student-athletes to help OSU win championships despite the cruel personal toll.

209.    OSU's inaction and pattern of deliberate indifference has been exhibited by the University at least since 1978, the year that Strauss was hired and first abused a student.

210.    This pattern of deliberate indifference persisted through Dr. Strauss's long career at OSU, despite notice to appropriate people, including multiple head coaches, the future Director of Athletic Training, Director of Student Health, and an Athletic Director, who could have and should have taken action.

211.    This pattern of deliberate indifference continued beyond Dr. Strauss's retirement, as evidenced by numerous, persistent reports and allegations of sexual abuse and misconduct across campus that were not properly addressed by the University and permitted the creation of a campus condition rife with sexual assault.

212.    Any policies or procedures in place at OSU during Dr. Strauss's tenure were clearly ineffective and inadequate and essentially served no purpose in protecting students.

213.    Ohio State's delay and deliberate indifference has created a hostile environment for its male students, particularly its male athletes.

214.    OSU's actions and inactions had the systematic effect of depriving Plaintiffs herein and countless other students of the educational benefits afforded to them through their enrollment in the University.

### III.    The OSU of Today Disparages the OSU that enabled Strauss and Proclaims Its Naiveté to his Assault on the Student Body During his 20-year Tenure.

*A.  2018: Public Outcry Compels OSU to Retain Perkins Coie to Investigate Itself*

215.    In April 2018, twenty years after Dr. Strauss's retirement, and forty years after the first allegation of abuse, former student athletes publicly accused OSU of covering-up for Strauss.

216.    To placate the public outcry, OSU hired an independent law firm, Perkins Coie, to investigate who at OSU knew what, and when, about sex abuse by Dr. Strauss against student athletes dating back to the late 1970s.

217.    OSU only began the investigation in an effort to protect its brand, after multiple former students came forward with their stories of abuse by Dr. Strauss, and these stories were publicized in the media.

218.    OSU expressed sympathy for the survivors but did not accept responsibility.

219.    Although many of Dr. Strauss's victims, including Plaintiffs in this case, felt that his exams were medically inappropriate and deeply uncomfortable, many of them did not realize these exams constituted illegal sexual abuse and harassment until after OSU publicized its investigation in 2018.

220.    Nor did these victims realize the magnitude or scope of Dr. Strauss's abuse of OSU students or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

221.    And many of Strauss's victims, including the Plaintiffs in this case, were revictimized by the opening of the Perkins Coie investigation in April 2018, having compartmentalized and repressed their memories of abuse for many years.

222.    They have been further revictimized in recounting the horrific details of their abuse to the "independent" investigators OSU paid to finally look into Dr. Strauss's legacy.

223.    The Perkins Coie investigators are no more than a team of lawyers, paid by OSU to canvas victims and frame the extent of OSU's potential liability.

224.    No detailed written statements were taken, and the victims were not provided their written statements for feedback, correction, or follow-up.

225.    The "investigation" was not professionally done: victims were not given the choice of male or female interviewers for this sensitive information. The lead investigators were white collar defense investigators, and there is no indication that they were trained in trauma-informed interviewing or counseling.

226.    The female interviewers who talked with Plaintiffs and others are not specially trained or certified for interviewing sex abuse victims; for example, one is an e-discovery/document review attorney at Perkins Coie.

227.    The "investigation" did not to change the culture at OSU: The victims who reached out to speak with Perkins Coie are not asked about how the OSU system could or should be fixed to prevent what happened for decades.

228.    OSU knows who the team members of the various sports were from 1978-2004, and who the male patients in its Clinic were from 1978-2004, but has done nothing to identify where they are now, and contact them—claiming instead it does not want to "re-traumatize" them by bringing up the past. This implies OSU knows it is likely that every male athlete was abused, that the abuse itself was painful, that they have repressed it for decades, and that coping with it will be painful even now.

229.    OSU doesn't want to be held accountable for employing a serial, sexual predator,

allowing him to abuse students for years, and then failing to take any remedial action to help these students.

230. If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse forty years ago, Plaintiffs would not have been abused by Dr. Strauss.

231. Since the allegations became public and OSU opened its investigation in early 2018, OSU has notice of Dr. Strauss's abuse of its students, including Plaintiffs herein, and yet it has taken no affirmative action to change or improve upon the culture of indifference or help the victims.

232. Only recently could OSU no longer hide behind its self-made veil of secrecy. With the jig finally up, OSU proclaimed its intent to help the victims heal despite its quiet efforts to kill Plaintiffs' claims along with their spirits.

233. It is time to hold OSU accountable.

234. Through this lawsuit, Plaintiffs demand that OSU acknowledge its failures, account for and compensate Plaintiffs for the damages these failures have caused, and institute real and meaningful change to ensure that no future OSU students endure such abuse and harassment.

235. After the filing of the First Amended Complaint in the related action, *Garrett et al. v. OSU*, 18-cv-692 (Doc. 33), as the Perkins Coie investigation dragged on, survivors who filed suit asked to speak directly with the OSU Board of Trustees to engage in a discussion about what might be done.

236. The Board granted Mr. Garrett's request, but literally that same day, its attorneys filed a motion to dismiss the survivors' claims.[47]

237. At the meeting of the OSU Board of Trustees, then-chairman of the OSU Board,

---

[47] Doc. 38.

Mr. Gasser (who subsequently resigned) "told the victims that appeared before the board that, [']rest assured, the board is not dismissing you. We're committed to doing the right thing."[48]

238.     However, despite Mr. Gasser's assurances to victims, OSU sat on its hands, with its motion to dismiss pending, and awaited the findings of Perkins Coie, which wouldn't come for another six (6) months.

239.     The Perkins Report was finally released in May of 2019.

240.     On May 24, 2019, Chairman Gasser resigned from the Board.

**B.** *2019: Perkins Coie Report Released -- Plaintiffs Discover OSU's Deliberate Indifference to the Sexual Assaults by OSU's Predator Physician*

241.     On May 17, 2019, after more than a year of investigation, the long-awaited Perkins Coie report was finally delivered.

242.     The Report does not whitewash OSU's culpability but is instead an indictment of OSU's repeated failures to escalate/report complaints of sexual abuse or to otherwise take action despite knowledge reaching the upper levels of the University's administration. OSU has not contested, but embraced, its findings—accepting its responsibility for the first time, apologizing to the survivors and the public. Now it must step up and own how it failed these survivors.

243.     The findings made in the Perkins Coie Report confirm the allegations made by Plaintiffs and provide additional insight into the severity of the abuse and the far-reaching implications of OSU's empowerment of Strauss.[49]

_____

[48] Transcript of Hrg Jan. 17, 2019, (Doc. 52, at 4: 4-6, 24) (Judge Watson recounting what he heard Mr. Gasser say).

[49] The Report outlines abuse by Strauss of students and student-athletes alike. It focuses on the abuse that occurred on the OSU campus, particularly in Larkins Hall and the student health center and at Strauss's off-campus "Men's Clinic of America." Though outside the purview of the Report's factfinders, it also details abuse by Strauss at medical/clinical trials, sports summer camp for minor children, at churches, high school wrestling tournaments, and in other avenues which he involved himself through his position at OSU—and used to abuse men and children, as young as

244. Survivors outlined Strauss's *modus operandi* to Perkins investigators and the Report detailed the stark similarities in these stories, described as "both highly credible and cross-corroborative."[50]

245. Of the 177 survivors interviewed by investigators, 153 were associated with Strauss through his role in the OSU athletics department.[51] In his role as team doctor to several sports, the report confirmed that Strauss was given unfettered access to student-athletes.[52]

246. A large portion of the Report described the trauma-informed approach employed to interview and fact-find and discusses difficulty in obtaining information from victims because of their profound distrust of institutions like OSU based on the abuse they suffered, "Many, if not most, of the men who contacted us did so with great hesitation."[53]

247. Those who did cooperate described the *quid pro quo* sexual abuse, the price the athletes had to pay to maintain their scholarships and place on the team. As early as Strauss's first year as team physician in 1979, the OSU Athletic Department and Sports Medicine program had

---

eleven years old. Strauss carried his perversion far and wide, and OSU cloaked him in legitimacy by lending its name and authority to him.

[50] Funk, Markus and Caryn Trombino, Perkins Coie LLP. *Report of the Independent Investigation, Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, May 15, 2019, p. 13. ("With rare exception, we found the survivor accounts concerning their experiences with Strauss to be both highly credible and cross-corroborative. Regardless of whether survivors attended OSU in the late 1970s or in the early 1990s, or whether they were student-athletes on the football team or non-athlete students treated by Strauss in the Student Health Center, their descriptions of Strauss' conduct were remarkably similar. Despite this consistency, the details contained in their individual accounts were unique and did not bear indicia of being "copycat" or coordinated, scripted stories. Adding further credibility, and as explained in this Report, the accounts of abuse were corroborated both by contemporaneous records we located in the Independent Investigation, as well as statements from other Investigation witnesses, including University employees and staff.")

[51] *Id*. at 42.

[52] *Id*. at 34-35.

[53] *Id*. at 13.

direct reports of Strauss's lewd sexual conduct.[54]

248.     His misbehavior was widely discussed within the athletics department, including his proclivity to conduct inappropriately lengthy and unnecessary genital exams, showering with the students, and his loitering in the student's locker room.[55]

249.     As concluded in the Report, these behaviors would continue for almost two more decades.

250.     By November 1994, when OSU's Medical Director/Head Team Physician sent a letter to Senior Associate Athletic Director, addressing "concerns" raised by the head coach for fencing, regarding male fencers' discomfort with Strauss, knowledge of sexual abuse by Strauss was widespread and an "open secret" amongst OSU employees.[56]

251.     However, the Perkins Coie Report outlines how it took another year and half, until June 1996, after three different students reported being assaulted by Strauss in less than a year, before OSU would even initiate action to limit his unfettered contact with students.

252.     The report concludes that even after OSU officials determined that Strauss's conduct was sexually abusive in nature, they allowed him to quietly retire and bestowed him with emeritus status.[57]

253.     The report details that OSU allowed him to lure male students to his "clinic" and repeatedly advertised in the school paper, with the knowledge that he had abused a plethora of male students, ultimately allowing him access to unsuspecting male students in the off-campus

---

[54] *Id*. at 2.

[55] *Id*. at 88.

[56] *Id*. at 92.

[57] *Id*. at 154.

location.[58]

254.    In support of its investigation, Perkins Coie retained two independent doctors to provide input on the medical necessity of all of Strauss's reported "procedures" and examination techniques; the expert physicians found that the reports made by survivors all described medically inappropriate and unnecessary methods—concluding that Strauss's action were all for his own sexual gratification.[59]

255.    Perkins Coie confirmed that *treatments provided for students and student-athletes served no medical purpose or justification, and only served to inflict extreme emotional and psychological trauma on his male patients.*[60]

256.    Many survivors and loved ones of survivors have described an "awakening" experience upon reading the Perkins Coie Report of the Independent Investigation.

257.    For the first time, survivors realized that they had not only been betrayed by Dr. Strauss, but that they were also betrayed by OSU.

258.    Many Plaintiffs herein believed their own instances of abuse by Strauss to be isolated, one-off events. They were too humiliated to disclose the abuse and those that did were shot down, not believed, ignored, or threatened by Strauss. OSU's hush-hush approach and long-term inaction effectively concealed the facts of Strauss's abuse and OSU's role in facilitating that

---

[58] *Id*. at 151.

[59] *Id.* at 12. ("In order to discern whether, and to what extent, Strauss' physical examinations of student-patients exceeded the boundaries of what was appropriate or medically necessary, it was essential for the Investigative Team to consult with suitably qualified medical experts. To that end, Perkins conducted a nationwide search for medical experts who met three essential criteria: (1) no affiliation with The Ohio State University; (2) significant experience serving as team physicians at the intercollegiate level; and (3) ability to speak to the prevailing medical practices applicable during the relevant time period. Ultimately, we retained two eminently qualified external physicians ("External Physicians") with whom we consulted in preparing our factual findings…")

[60] *See generally Id*. at 43-68. (emphasis added)

abuse.

259.     Even if Plaintiffs herein had known that Dr. Strauss's conduct constituted sexual assault, Plaintiffs were not aware of any formal OSU grievance procedure to complain about Dr. Strauss.

260.     Even if Plaintiffs had known that Dr. Strauss's conduct constituted sexual assault and/or had known to complain, or in fact did complain, Plaintiffs had no reason to know the role that OSU had played in facilitating the abuse: OSU received but ignored or rebuffed or concealed complaints against Strauss, which prevented Plaintiffs from discovering their claims against OSU.

261.     Due to OSU ignoring and rebuffing and concealing complaints, any investigation by Plaintiffs would have been futile.

262.     It wasn't until reading news coverage of the OSU investigation in 2018 or the Perkins Coie Report in 2019 that Plaintiffs were certain that Dr. Strauss's conduct was not medically necessary and that it was, in fact, sexual assault.

263.     It wasn't until the Perkins Coie Report was released that Plaintiffs herein realized the magnitude or scope of Dr. Strauss's abuse of OSU students, or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

264.     It wasn't until the Perkins Report was released that Plaintiffs realized that OSU had knowledge of Strauss's sexual abuse of male students for decades and chose to ignore it.

265.     It wasn't until the Perkins Coie Report was released that Plaintiffs realized that OSU had received repeated complaints about Strauss's prolonged genital examinations and other disturbing sexual proclivities but took no action against him.

266.     It wasn't until the Perkins Coie Report was released that Plaintiffs realized that OSU athletic directors, coaches, trainers, administrators, physicians, executives and deans alike all

knew about reports made by students against Strauss and did nothing.

267.    It wasn't until the Perkins Coie Report was released that Plaintiffs realized that they weren't alone, and that many hundreds of other OSU male students between 1978-1998 had been sexually assaulted, sodomized, penetrated, molested, groped, and emotionally scarred because of OSU's deliberate indifference.

268.    It wasn't until the news coverage of the OSU investigation in 2018 and/or the Perkins Coie Report was released in 2019 and Plaintiffs discovered how OSU failed them that many of them even decided to come forward, identifying themselves as victims **for the first time**—to investigators, to attorneys, to spouses, to family members, and even to themselves.

269.    As one survivor so aptly put it, "Strauss had a type. Naïve." And OSU gave him authority, access, and unfettered opportunity to sexually abuse and exploit as many of these young, naïve students as possible.

270.    The Plaintiffs herein reported being subjected to Strauss's abuse in the following nonexclusive ways:

   a.    Sodomy/anal intercourse

   b.    Oral Sex / Digital Penetration / Masturbation

   c.    Groping / Fondling / Genital Touching

   d.    Abuse without touching (Showering/Exposure/ Voyeurism/ Photography/ Sexual Proposition/Lewd Comments)

271.    100% of the Plaintiffs individually represented in this lawsuit report being physically sexually molested by Strauss—a staggering statistic that OSU cannot ignore.

272.    What the Perkins Coie Report did whitewash were gruesome and horrifying details of abuse of young men who were sodomized, drugged and preyed upon by Strauss during their most impressionable years, and in their most vulnerable moments – while seeking medical

care.

273.    The report goes into detail regarding molestation and clear sexual assault by Strauss, but conspicuously leaves out the stories that still haunt and torment these men today, thirty years later.

274.    Some survivors recount being injected by Strauss by what they believed to be medicine and then waking up, disrobed, with no memory of what had happened to them. What Strauss did to these young men during these dark periods of unconsciousness is what will haunt them for the rest of their lives.

275.    Another survivor was sexually abused by Strauss while he was conscious, but was physically incapacitated and unable to protest or otherwise stop Strauss from assaulting him.

276.    Most horrifying yet, some survivors were anally penetrated by Strauss.

277.    Being sodomized by a University-sanctioned professor and medical doctor is an unfathomable trauma and Perkins Coie confirmed how prevalent Strauss's abuse of male students was on OSU's campus during his two decades of employment.

278.    Strauss's abuse—which OSU allowed to continue unchecked throughout his long tenure—traumatized many victims for decades. Indeed, some victims continue to be afraid to see doctors to this day, causing them to neglect their health and to receive dangerous diagnoses late.

279.    Although complaints of disturbing sexual assault by Dr. Strauss mounted over the years, OSU took no action. OSU did no further investigation of the above reports. OSU did not impose conditions on his continued employment, such as a chaperoning policy. OSU did not terminate Strauss. OSU did not pass on the above reports to the Ohio Medical Board. OSU did not pass on the above reports to law enforcement.

280.    The Perkins Coie Report ticks through the various OSU departments where

Strauss was employed: Student Health, Athletics Department, Medical Center etc. and who, in each department, over the span of his tenure, had knowledge of reports of Strauss's misconduct.

281.    If any one of the dozens of OSU agents with knowledge had taken action, investigated further, escalated the reports to OSU executives or reported to law enforcement, Strauss's reign could have been stopped. But these people, individually and collectively, did nothing.

282.    The Perkins Coie Report is significant in its account of how many people admitted, in 2018-2019, that they knew about Strauss *back then*.

283.    These numbers do not reflect the many other OSU agents with memory lapses, memory blocks, death or disability, or for those who refused to cooperate with Perkins Coie for fear of their own personal liability in allowing Strauss to carry on with his abusive treatment of students.

284.    At least two (2) OSU Athletic Directors received reports about Strauss.

285.    At least two (2) OSU Head Team Physicians received reports about Strauss.

286.    At least six (6) OSU Assistant Athletic Directors received reports about Strauss.

287.    At least five (5) OSU Team Physicians received reports about Strauss.

288.    At least twenty-two (22) OSU Coaches received reports about Strauss.

289.    At least one (1) OSU Athletic Training Director received reports about Strauss.

290.    At least four (4) OSU Athletic Trainers received reports about Strauss.

291.    At least eighteen (18) OSU Student Trainers received reports about Strauss.

292.    At least four (4) OSU Student Health Officials received reports about Strauss.

293.    At least three (3) OSU Student Health employees received reports about Strauss.

294.    An unknown number of other OSU personnel, executives, lawyers, trustees and/or

other OSU officials were aware of complaints against Strauss, or at a minimum, had heard rumors about his disturbing conduct while treating male students.

295.     Any one of these individuals, each an agent of OSU, was an appropriate person under the law.

296.     Any one of these individuals was in a position to protect students.

297.     But for two decades, while thousands of unsuspecting students were subjected to rape, sodomy and pervasive sexual molestation, and harassment, OSU took no action to investigate, to intervene, to share, to escalate, to publicize, to remove, to discipline, to report or to otherwise protect students from him.

C.   *Following the Release of the Perkins Coie Report, OSU Finally Acts – But Only to Protect Its Brand, Control Public Relations, and Silence Survivors*

298.     Instead of taking accountability for its role in perpetuating the sexual assaults of innocent students, as Perkins Coie confirmed, OSU used the release of the report as an opportunity to gain ground in the court of public opinion, using the media to portray the University as deeply empathetic.

299.     Following the release of these damaging findings, on May 16, 2019, President Drake proclaimed: "It's outrageous that the university fundamentally failed to prevent this abuse decades ago… Ohio State will continue to marshal resources to support survivors and contribute to the national effort of combating sexual misconduct and abuse."

300.     But OSU has not "marshall[ed] resources to support survivors," instead it has asked this Court to dismiss them.

301.     In June of 2019, the parties attended the Court-ordered mediation, which was unsuccessful.

302.     After mediation, on June 27, 2019, OSU again paid lip service to its commitment

to Plaintiffs. Chris Davey, Ohio State's Associate VP of University Communications announced: "Richard Strauss' actions are reprehensible, and the university's inaction at the time is unacceptable. ... We are grateful to all those who have come forward to share what happened. We remain deeply concerned for everyone affected by Strauss' actions, and the university remains firmly committed to the mediation process outlined by the federal court."

303.     Desperate to make a good public show, OSU made another typical pronouncement that it was "grateful" for the victims coming forward, "deeply concerned" about them, and "firmly committed to the mediation process"—but instead OSU continues to hang its hat on its statute of limitations argument, seeking to extinguish Plaintiffs claims.

304.     Davey's quote came on the heels of testimony earlier that day, by five brave Strauss survivors, who recounted the gruesome and disturbing details of their abuse to the Ohio House Civil Justice Committee.  The troubling recollections by these men could be felt by every soul in the statehouse that day and every person who watched from afar.

305.     Even OSU could not deny that what was expressed by these victims was profoundly upsetting… but yet OSU seeks to dismiss the victims in this Court as if they never existed.

306.     What is contained in the Perkins Coie report is just a smattering of the evidence which imputes liability on OSU for the years of abuse by Strauss.

307.     For example, the report determined that Dr. Strauss abused at least one-hundred and seventy-seven (177) victims during his time at OSU.

308.     In reality, this number is far-greater, as evidenced by the filing of this lawsuit and several others, on behalf of at least 300 victims. The numbers don't lie. These men were repeatedly sexually abused by Strauss at different times, in different manners.

309.     The damage resulting from OSU's failure to remove Strauss is overwhelming, and the details of the abuse and OSU's coverup of the abuse are still coming to light today and his victims begin to understand OSU's role in what they suffered silently for all these years.

310.     On October 1, 2019, OSU released crime statistics for reports made on campus and in properties adjacent to campus, pursuant to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act Report")—and the results were staggering.

311.     For the first time, OSU confirmed reports of **1,429 instances of fondling and 47 instances of rape attributable to Strauss.**[61]

312.     The numbers published in the 2019 Clery Act Report demonstrate that Perkins Coie's Report is limited and nonconclusive—and suggest that many more than 177 victims suffered at the hands of Richard Strauss.

313.     OSU used the release of these findings as an opportunity to give lip-service support to survivors and their loved ones. President Drake e-mailed OSU alumni and former student-athletes more meaningless proclamations: "Strauss' actions and the university's inaction at the time were unacceptable. I want to reiterate our profound regret and sincere apologies to each person who endured Strauss' abuse — and our gratitude for the strength and courage of all who shared their experiences."[62]

314.     But these are merely words and not action: OSU's gratitude for the strength and

---

[61] *University issues annual crime report*, October 1, 2019, https://news.osu.edu/university-issues-annual-crime-report/ (last visited October 10, 2019)

[62] The Ohio State University, Office of the President, *A Message from President Drake: Strauss Investigation Update*, October 1, 2019, https://president.osu.edu/presidents/drake/news-and-notes/2019/a-message-from-president-drake-strauss-investigation-update-oct-2019.html (last visited October 10, 2019)

courage of all who shared their experiences remains to be seen.

315.     Indeed, consistent with its two-faced approach, OSU has remained loyal to its commitment to dismissing Plaintiffs' claims under Ohio's current two-year statute of limitations.

316.     These naïve men arrived on campus in Columbus, inspired by the next four years ahead of them at a University they loved. Strauss took their innocence, and OSU betrayed them. The conduct of the University and its doctor forever changed their lives.

317.     Survivors are still paying for what Strauss did to them as OSU students—what OSU authorized him to do.

318.     Many of them suffered humiliation, depression, dropped out of school, received failing grades or quit their sports team and relinquished their athletic scholarships—all to escape Strauss and the university that allowed him to prey on them. In turn, they had their livelihoods stolen as well.

319.     For many of them, the entire trajectory of their life was altered.

320.     Reading the Perkins Coie Report, which put each Plaintiff's personal experience of abuse in context with the many many who suffered, over many many years and with so much awareness by many in university leadership, connected all the dots for these Plaintiffs and put in sharp focus, for the first time, the role that OSU played: Not only were these men victims of Strauss, they are victims of OSU's failed policies and deliberate indifference.

*D.  Today: The Undisputed Facts Reveal That OSU Institutionally Protected and Emboldened Strauss, Yet it Continues to Unnecessarily Drag his Victims Through the Mud.*

321.     For two years, OSU has been on direct notice that its deliberate indifference in the 1970s, 1980s and 1990s led the sexual abuse of hundreds of male students.

322.     The Plaintiffs in this case have repeatedly been put through the ringer as additional, disturbing and painful details have continually been revealed about how and why OSU

enabled a sexual predator to serve as a physician to the student body.

323.



324. It's been two years since news publicly broke that The Ohio State University employed and harbored a known sexual abuser as a student health services physician and athletics team doctor for nearly two decades.

325. It's been two years since The Ohio State University pledged its commitment to uncovering the truth about what Dr. Richard Strauss did to its innocent students, what OSU knew, when it knew it, and what (if anything) OSU did about it.

326. It's been a year and a half since OSU's Board of Trustees told survivors that OSU was "not dismissing [them]" and that it was "committed to doing the right thing".

327. It's been a year since the multi-million-dollar Perkins Coie investigation into OSU's involvement in the Strauss scandal publicly revealed for the first time that many OSU

employees and officials (called "appropriate persons" under the law) received credible reports that Strauss was sexually assaulting students throughout his career as a university employee and team physician—and silently did nothing.

328.    It's been over a year since Rep. Brett Hillyer introduced legislation that would specifically lift the unfair statute of limitations for this undeniable disaster at OSU.

329.    It's been nearly a year since Governor Michael DeWine released the findings of an independent task force, which confirmed "Strauss' repeated sexual abuse of his patients went effectively unaddressed for nearly the length of his tenure at Ohio State."

330.    In 2018,[63] and still today, Ohio State's Strategic Plan vows that:



**What Ohio State does matters. And how we do it matters….**
**We owe it to our students, our faculty, our staff and to our community. We owe it to ourselves. And, because we are Ohio State, we owe it to the nation.**

331.    Plaintiffs file this lawsuit in the hope that Ohio State will make good on that promise. Ohio State is right: now is the "time" for "change".

332.    To make a change, Ohio State must take responsibility for a dark chapter in its storied history, a chapter during which its doctor and assistant professor, Dr. Richard Strauss, sexually assaulted, battered, molested, and/or harassed thousands of its students.

333.    The victims of Dr. Richard Strauss still wait for the day that OSU's actions mirror

---

[63] The Ohio State University, Office of the President, https://president.osu.edu/strategicplan/ (visited July 16, 2018 and October 1, 2019).

the words. They still await OSU taking accountability for employing and emboldening a serial sexual abuser for nearly two decades and then subsequently covering up the University's role in perpetuating the abuse for another two decades.

   E.  *OSU Employees and Physicians who Refused to Participate in Perkins Coie's Investigation Testify About the Extensive Institutional Cover-up for Strauss.*

334.   As this case has dragged on, Plaintiffs continue to grapple with how Strauss's actions went unchecked for so long by OSU. When given the opportunity to depose six (6) former OSU doctors who worked side-by-side with Strauss, the same overarching theme revealed itself: that the culture at OSU was to protect Strauss and keep students – and Strauss's colleagues – in the dark about his dangerous proclivities.

335.   Physician after physician testified that he was never informed by his predecessor, supervisor, or colleagues in other departments about the onslaught of complaints lodged by students about Strauss.

336.   Once these doctors heard the concerns themselves, firsthand, they carried on in the same fashion as those before them, they didn't report Strauss up the chain, they didn't investigate students' reports, they didn't discuss Strauss's sexually deviant behavior with other students or staff, they didn't report Strauss to the medical board or local authorities. They simply perpetuated the culture of secrecy surrounding Richard Strauss's repeated sexual assaults of students.

337.   Dr. John Lombardo, who served as OSU Sports Medicine Director for nearly fifteen years, provided explosive testimony about how he pacified all indicators of Strauss's danger.

338.   When first put on notice about Strauss showering with students in the early 1990s, Lombardo did nothing but ask Strauss about it, and Strauss confirmed so Lombardo decided no

further investigation or discipline was necessary.[64]

339.     Lombardo testified that he never had any discussions with any OSU medical staff to inquire about Strauss,[65] never informed athletic directors Andy Geiger or Jim Jones that Strauss was perpetually showering with student athletes,[66] never inquired with a single student[67] or athletic trainer[68] about Strauss and never reported Strauss to any other OSU official,[69] despite Charlotte Remenyik's demand that Strauss be precluded from treating the fencers she coached.

340.     In the years before the reports at Student Health, by Students A, B and C, which ultimately forced Strauss into early "retirement", Dr. Lombardo was confronted with the reality that Strauss was inappropriately showering with athletes[70] and was (at a minimum) acting and treating male athletes inappropriately.

341.     Instead of conducting an actual investigation to determine what was occurring and why such complaints were being lodged against Strauss, like other doctors who received similar reports, Lombardo was simply satisfied after speaking to Strauss and chalking up the reports of prolonged exams and sexual abuse as rumors.[71]

---

[64] Lombardo Dep. 95:7-9, 96:1-6. Nov. 12, 2019.

[65] Lombardo Dep. 49:19-25. Nov. 12, 2019.

[66] Lombardo Dep. 96:14-25, 97:1-24. Nov. 12, 2019.

[67] Lombardo Dep. 48:1-3. Nov. 12, 2019.

[68] Lombardo Dep. 195:23-25, 196:1. Nov. 12, 2019.

[69] Lombardo Dep. 195:8-10. Nov. 12, 2019.

[70] Lombardo Dep. 16:1-23. Nov. 12, 2019.

[71] Lombardo Dep. 95:12-25, 96:1-6, Nov. 12, 2019.
12 Q. Okay. Other than talking with Dr. Strauss, did you do any investigation of Dr. Strauss being in the shower with athletes?
15 A. Not that I remember.
16 Q. Did you speak to any coaches about Dr. Strauss being in the shower with athletes?
18 A. I don't remember.
Q. For example, did you speak with the gymnastics coach?

Paul Krebs
Department of Athletics
St. John Arena
410 Woody Hayes Drive
CAMPUS

Dear Paul:

I have investigated the concerns raised by the fencing coach, Charlotte Remenyik, concerning her athletes and the medical care system.

I have spoken with her and her concerns are based on rumors which have been generated for 10 years with no foundation. However, due to the pervasive nature of these rumors, the male athletes do not feel comfortable with Dr. Strauss as their physician.

I have spoken with Dr. Strauss concerning this issue. He is aware of the unfounded rumors which began 10 years ago among the fencers and has never been informed as to any problems concerning the rumors. In view of the present situation, Dr. Strauss has suggested that another physician, in this case Dr. Trent Sickles, assume the primary role as physician for the fencers. I have spoken with Dr. Sickles and he is agreeable to this.

In my discussions with both Dr. Strauss and Coach Remenyik, there has been no information given which would necessitate further investigation of this situation.

If you have any questions concerning this, please contact me.

Sincerely,

John A. Lombardo, M.D.
Director of Sports Medicine

342.

343.     When asked about what Remenyik's complaints and what he did to investigate them, Lombardo claimed amnesia.[72]

344.     Further, despite the close proximity in time between Lombardo's "investigation" into Strauss and subsequent reports by the three male students at Student Health, no OSU official ever alerted Lombardo to the fact that other, similar allegations against Strauss were made.[73]

---

21 A. Um, I don't know if I talked to Peter, no.
23 Q. Or any of the fencing coaches?
24 A. Um, I didn't talk to them -- I don't remember talking to them ever, so...
Page 96: 1 Q. Or any of the swimming coaches?
2A. Um, they're both my patients, so -- I don't remember talking to them about it, though.
4 Q. Or any of the wrestling coaches?
A. He was my patient, and I don't remember talking to him about it.

[72] Lombardo Dep, 34:19-23, 38:13-25 ("I don't recall the letter. So basically it's going to be the same answer to anything you ask.") 39:13-24, 40:4-25, 41:1-11. Nov. 12, 2019.

[73] Lombardo Dep. 51:23-25, 52: 1-3, Nov. 12, 2019.

345.     More disturbing, the other OSU doctors deposed all testified that the cloud of deception about Strauss's ability to appropriately practice medicine in the athletics department hung over all the other OSU medical departments as well.

346.     Doctors John Lombardo, Ted Grace, and Roger Miller all similarly testified that they did not share any information about Strauss with one and other, despite the fact Strauss was actively treating innocent students while clear indicators of his dangerous proclivities swirled throughout campus.

347.     As described herein and in the Perkins report, Dr. Grace handled three different complaints from students in 1995 and 1996 about Strauss sexually assaulting them, yet never shared this information with his colleagues or subordinates.

348.     Keeping information about Strauss shrouded in secrecy was the status quo at OSU, as confirmed by Grace's deposition, where he testified that prior to his investigation into Strauss in 1996, he had never been told by the Athletics Department staff, athletics coaches or student trainers of the dozens of allegations about Strauss in their department that had been present for years[74] or that Strauss had been relieved of his wrestling team physician duties.[75]

349.     Dr. Roger Miller worked side-by-side with Grace as the Chief of Preventative Medicine and was then Lead Physician at OSU Student Health, but testified that the first time even he knew about the extent and number of reports made to Grace at Student Heath about Strauss was when he read the Perkins report in 2019.[76]

350.     Dr. Grace never shared with Dr. Miller his concerns or that he had imposed time

---

[74] Grace Dep. 93:15-25, 94:1-25, 95:1-25. Nov. 20, 2019.

[75] Grace Dep. 91:8-11. Nov. 20, 2019.

[76] Miller Dep. 190: 1-13. Feb 12, 2020.

restrictions on the length of Strauss's genital exams or that he wanted Strauss to be chaperoned during his exams.[77]

351.    When asked about his reaction to learning all of this information for the first time in 2019, Dr. Miller stated: **"Well, I was appalled by the length of time that things had been going on with Dr. Strauss and by the fact that I was not aware of any of those allegations at the time he was working at Student Health**"[78], that he "was shocked by it"[79], that he had known all of this back in the 1990s he would have certainly had concerns about allowing Strauss to see patients and would have investigated to stop Strauss from treating male students at the Men's Clinic.[80]

352.    Dr. Miller said that he was likely kept in the dark about all the reports against Strauss because Grace felt "it had been addressed."[81]

353.    Instead of alerting authorities, law enforcement, the medical board or anyone with the ability to stop Strauss from practicing medicine, Grace testified that he did everything he could[82] and alluded to the fact that he should be patted on the back for being the first and only person at OSU who limited Strauss's ability to treat students.[83]

---

[77] Miller Dep. 206:18-25, 207:1-7. Feb 12, 2020

[78] Miller Dep. 22:21-25. Feb 12, 2020. (emphasis added)

[79] Miller Dep. 271: 10-12. Feb 12, 2020.

[80] Miller Dep. 304: 8-25, 305:1-23. Feb 12, 2020.

[81] Miller Dep. 218: 4-20. Feb 12, 2020.

[82] Grace Dep. 315: 5-24. Nov. 20, 2019. ("But you can only do what counsel, HR, student affairs supports. And I'm not saying they were standing in my way, but I was—they were giving me advice and I was following it.")

[83] Grace Dep. 315: 5-13. Nov. 20, 2019. ("…when it came to taking away clinical practice, I—I'm the one that did. And I felt good about that. Ant it wasn't easy. And, so, do you say do I wish I had it different, I still feel like I dd the right thing.")

354.     In fact, after Grace assisted in investigating Strauss and ultimately suspending Strauss from Student Health after the three separate reports from Students A, B and C, Grace still did not report Strauss to the Ohio Medical Board, until after Strauss actually reported Grace in retaliation for the discipline. For four months, Grace sat on the information that Strauss sexually assaulted students and failed to report this to the board tasked with monitoring doctors' medical licenses.[84]

355.     Aside from actively hiding and/or being hidden from relevant information about Strauss's abuse of innocent students, many of these physicians testified that they even found it hard to believe that what Strauss was doing to students was sexual abuse.

356.     The depositions of these physicians (all of whom have earned multiple degrees, board certifications, accolades and conducted extensive medical research in their respective fields) revealed their own lenses during the time period in which Strauss was assaulting students and provided great insight into why many of the students didn't know they were being victimized.

357.     Under oath, Dr. William Malarkey, board certified in internal medicine and endocrinology and metabolism, who has been practicing medicine for over 50 years, testified:

> "A. Sexual abuse -- this is a fact I learned 40 years ago, 50 years ago. It's called incest. It's very common in families. So chances are a high percent of your female patients have had sexual abuse.
> Q. What about male patients?
> A. We never thought that exists, but I'm sure that that's true also. Not maybe to the same extent. Probably not to the same extent.
> **Q. You never thought male patients could be sexually abused?**
> **A. No."[85]**

358.     In the same vein, when asked during his testimony if it would be appropriate for a doctor at OSU in the 1990s to stroke a patient's penis to the point of erection, Dr. Lombardo

---

[84] Grace Dep. 276: 9-24, 278: 16-23. Nov. 20, 2019.

[85] Malarkey Dep. 140: 2-14. Nov. 22, 2019.

answered "No." But when asked if was sexual abuse, he followed up "That would be inappropriate."[86]

359.   Dr. Trent Sickles also testified that some patients would not know if the treatment they were getting from a physician was medically appropriate given their symptoms and that it's possible that a patient would have no idea they were being sexually abused by the doctor.[87]

360.   In discussing findings by Perkins Coie regarding actions by Strauss that constituted sexual assaults, Dr. Forrest Smith confirmed that "For some situations" it would require the expertise of a medical professional to determine if the actions were indeed abuse.[88]

361.   Most appalling, though, was the deposition of Dr. Grace, who repeatedly said that actions taken by Strauss were inappropriate but not assault. He clarified "But assault to me is forcing on someone… Most medical exams are being done by consent and it's hard to call that assault."[89]

362.   During the pendency of an investigation by the State Medical Board of Ohio, Dr. Grace only recently permanently surrendered his Ohio medical license in lieu of imposed disciplined. The board cited Grace for not reporting complaints about Strauss and for falsely stating that there hadn't been previous complaints about Strauss to a Strauss survivor and Plaintiff in related case.[90]

363.   The fact that these doctors, all present at OSU in the 1990s, could not readily

---

[86] Lombardo Dep. 215:3-10, Nov. 12, 2019.

[87] Sickles Dep. 168: 16-19. Nov. 21, 2019.

[88] Smith Dep. 113: 15-19. Feb. 13, 2020.

[89] Grace Dep. 323: 15-19. Nov. 20, 2019.

[90] *Former Ohio State student health director Ted Grace, who failed to report a doctor's misconduct, surrenders his medical license*, Apr. 14, 2021. https://www.espn.com/college-sports/story/_/id/31258281/former-ohio-state-student-health-director-ted-grace-failed-report-doctor-misconduct-surrenders-medical-license (last visited May 14, 2021)

identify Strauss's actions as sexual abuse provides insight into why teenaged and 20-something students, with no medical training or training in identifying sexual violence, weren't always aware that they had been victimized by Strauss.

364.    Grace also identified another fact that may have discouraged victims from coming forward—Strauss's demeanor.

365.    Grace testified that Strauss was vindictive[91] and despite the fact that Grace was his boss, Strauss "intimidated the heck out of [him],"[92] saying "he could just rip you apart with is eyes and his speech."[93]

366.    Even more telling was Dr. Miller's statement that Grace did not get easily intimidated and that he had seen Grace in many tough situations.[94]

367.    Richard Strauss's callous and cruel behavior was enough to give his own boss pause, and it does not take a vivid imagination to envision a common scenario where he intimidated and inflicted fear in his young, innocent, student victims.

368.    Most troubling still, even if all these doctors had been given the appropriate notice and warnings about Strauss's sexual assault of students, they all repeatedly testified that OSU had no policies or safeguards in place to recognize or report sexual abuse during Strauss's tenure (and until at least 2000).

369.    The lack of any procedure and/or training on how to report sexual abuse was indicative of OSU's institutional indifference of the rights of its students, particularly victims of sexual abuse.

---

[91] Grace Dep. 374: 1-12. Nov. 20, 2019.

[92] Grace Dep. 76: 1-3, 374: 1-12. Nov. 20, 2019.

[93] Grace Dep. 75: 19-21. Nov. 20, 2019.

[94] Miller Dep. 241: 10-12. Feb. 12, 2020.

370.     When asked point-blank in his deposition, "When you worked at OSU, if you yourself witnessed sexual abuse of a patient by a doctor, did you understand that you had any reporting obligations to anybody?" Lombardo responded "No. And -- no, not that I did (sic)."[95]

371.     Lombardo (who was the Director of OSU Sports Medicine at the time) said that he was unaware that he had any obligation to report Strauss to the medical board even if he had determined Strauss was doing inappropriate exams of the athletes.[96]

372.     Lombardo also responded in the negative to the following inquiries: 1) whether OSU trained him to report allegations of sexual abuse/assault, 2) whether there were any policies or procedures in place to guide him in handling allegations of sexual abuse/assault, 3) whether he received training regarding how to investigate allegations of sexual abuse/assault, 4) whether he even knew what a "mandated reporter" was, or 5) *whether he, as a physician, was a mandated reporter*.[97]

373.     Dr. Sickles confirmed Lombardo's testimony that he wasn't aware of any OSU policies related to reporting sexual abuse, investigating allegations of sexual abuse, or policies on how to report issues with personnel.[98] He further confirmed that he received no training from OSU on how to report or investigate claims of sexual misconduct during his tenure.

374.     Dr. Miller stated that the first time he received training from OSU about sexual harassment was "probably around 2000".[99]

375.     And Drs. Grace and Malarkey said under oath that they were not aware of any

---

[95] Lombardo Dep. 115: 1-5, Nov. 12, 2019.

[96] Lombardo Dep. 24: 13-25, 25: 1-12, 32: 21-24, 50: 1-8. Nov. 12, 2019.

[97] Lombardo Dep. 23: 1-23, Nov. 12, 2019. (emphasis added)

[98] Sickles Dep. 48: 1-17, 92: 6-23. Nov. 21, 2019.

[99] Miller Dep. 45: 5-14, 46: 11-19. Feb. 12, 2020.

policies regarding investigating sexual misconduct during their tenures at OSU.[100]

376. The weight of the testimony from these accomplished physicians regarding their lack of knowledge about how, what or who to report sexual abuse to and OSU's lack of any procedure for reporting or investigating sexual misconduct speaks volumes about how lost and confused a student who wanted to report sexual assault by an OSU doctor would be.

377. As with the individuals who led OSU's student health and sports medicine programs, if a student wanted to report Dr. Strauss, there was no guidance or policies or avenues for doing so.

378. And in light of the tight-lipped, under-the-rug culture at OSU, any report—or attempt to investigate the existence of other, prior reports—would have met a dead end.

379. In short, the testimony of these six (6) physicians establish the culture of OSU during Strauss's time at the University: It was a widespread and intentional culture of silence, cover-up, and deliberate indifference to sex crimes. When confronted with reports of Strauss's behavior, officials either accepted his explanations and moved on, or ignored the reports because they didn't know how to escalate them. This official policy (a lack of policy) substantially increased the risk that students would suffer sexually harassing and abusive misconduct, and Plaintiffs did suffer this abuse.

380. If a single one of these OSU physicians had wanted to "do the right thing" and prevent Strauss from treating and abusing students, they didn't even know how or where to report him within the OSU system, just like the innocent students Strauss victimized.

## CLASS ACTION ALLEGATIONS

381. Plaintiffs bring this action individually and pursuant to Federal Rule of Civil

---

[100] Grace Dep. 131: 10-13. Nov. 20, 2019.; Malarkey Dep. 85: 15-25. Nov. 22, 2020.

Procedure 23 (b)(3) or (c)(4) on behalf of themselves and the following

"Nationwide Class":

> All male students, student athletes, invitees, and alumni who (1) were examined by or interacted with or endured any contact with Dr. Richard Strauss from 1978-1998 or (2) participated in a varsity athletic sport that utilized the locker rooms, showers, and/or saunas at Larkins Hall at any time between 1978 and 1998. Excluded from the class are (1) individuals who have already filed suit in Case No(s). 18-cv-0736, 18-cv-0692, 19-cv-2462, 19-cv-4746, 20-cv-03817 as of the date of this Complaint, and (2) individuals who filed suit under the following Cases, which have already settled: 2:19-cv-2237, 2:19-cv-1911, 2:19-cv-5418, 2:19-cv-3165, 2:19-4397, 2:19-cv-4624, 2:19-cv-4634, 2:19-cv-5551, 2:20-cv-1188, 2:19-cv-2429, 2:20-cv-1385, and 2:19-cv-4433, or who have otherwise already settled their claims.

382.    The Classes consist of hundreds, if not thousands, of men throughout the United States, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by the Ohio State.

383.    The claims of Plaintiffs are typical of the Classes. The claims of the Plaintiffs and the Classes are based on the same legal theories and arise from the same factual pattern involving the Defendant's misconduct.

384.    There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2), (b)(3), and (c)(4).

385.    Common questions of fact or common questions of law affecting members of the Class include, but are not limited to, the following:

> a.   Whether Defendant violated Title IX of 20 U.S.C. §1681?
>
> b.   Whether Defendant displayed deliberate indifference to the sexual abuse, assaults, and discrimination at Ohio State?
>
> c.   Whether Defendant had knowledge or notice that Richard Strauss was engaging in sexual abuse of Ohio State's male students and student-

athletes?

d. Whether Defendant concealed, dismissed, discouraged or rebuffed complaints that, if handled reasonably and timely (and in compliance with Title IX) would have prevented future abuse?

e. Whether Title IX claims are subject to a statute of limitations?

f. Whether borrowing a state limitations period and applying it to a federal law violatse procedural and substantive due process?

g. Whether the importation of state statute of limitations or estoppel or discovery rules inconsistent with federal law and the Constitution?

h. Whether this Court lawfully impose the 2-year statute of limitation period set forth in Ohio Rev. Code § 2305.10(A)?

i. Whether Plaintiffs had reason to investigate or could have discovered OSU's role in causing their abuse prior to May 2019 when the Perkins Coie report was released?

j. Whether Plaintiffs were damaged by the violations caused by Defendants?

386.     Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to liability, in that it conserves the resources of the courts and the litigants and promotes the consistency and efficiency of adjudication.

387.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, and who have expertise in prosecuting personal injury, sexual abuse, and civil rights cases on behalf of vulnerable victims.

388.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and they have the financial resources and experience in handling sex abuse cases to do so.

389.     Plaintiffs have individually executed contingency fee contracts with their counsel, which entitles counsel to the right to assert a lien for all work done which results in a monetary recovery. Counsel hereby provides notice of its intent to assert an attorneys' charging lien on any settlement or judgment resulting from this action.

390.     Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class.

391.     Plaintiffs and the Class will have personal injury damages that are individualized and that can be managed separately.

## CLAIM FOR RELIEF

### Violation of Title IX, 20 U.S.C. § 1681, *et seq.*

392.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

393.     Title IX, 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…."

394.     Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities.

395.     Under Title IX, sexual harassment is any type of unwelcome conduct of a sexual nature and "includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature."

396.     Plaintiffs are "persons" within the meaning of 20 U.S.C. §1681(a).

397.     Defendant OSU receives federal financial assistance and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §1681, et seq.

398.     Title IX contains no limitations period on claims brought thereunder.

399.     As the U.S. Department of Education's Office of Civil Rights has explained, Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students, and third parties.

400.     Dr. Strauss's actions and conduct were carried out in his capacity as a team doctor and assistant medical professor of OSU or otherwise as an employee or agent of the University, and/or in the context of OSU programs or activities.

401.     At all times relevant times, OSU had the authority to control, direct, discipline, report, limit, and/or terminate Dr. Strauss.

402.     Dr. Strauss's sexual assault, battery, molestation, and harassment of Plaintiffs, including the fondling of testicles, fondling and masturbation of penises, nonconsensual digital anal penetration, sodomization, and lewd and voyeuristic harassment in communal showers, was sexual discrimination and sexual harassment under Title IX.

403.     Pursuant to Title IX, Defendant OSU was obligated and required to investigate all allegations of sexual assault, battery, molestation, and harassment, including allegations that sexual assault, battery, molestation, and harassment has been committed by an employee, student, or third party.

404.     Defendant OSU owed Plaintiffs duties under Title IX, which duties included not to engage in and be deliberately indifferent to known sexual assault, battery, molestation, harassment, or any other form of sexual misconduct.

405.     An "appropriate person" of OSU, within the meaning of Title IX, including but not limited to, former Athletic Director and Assistant University Vice President Andy Geiger, former Athletic Director Jim Jones, former OSU medical director Dr. John Lombardo, former OSU Vice President David Williams, former OSU student health physician Dr. Roger Miller, former

head wrestling coach Russell Hellickson, former head tennis coach John Daly, Director of Student Health Ted Grace, M.D., former assistant athletic trainer Bill Davis (later Director of Athletic Training at OSU), current university president Dr. Michael Drake, and other OSU faculty, staff, administrators, executives and officials (over the course of forty years) had actual and/or constructive notice of sexual assault, battery, molestation, and harassment committed by Dr. Strauss as described herein this Complaint.

406.     Thus, the complaints of sexual abuse at Ohio State involving Dr. Strauss were not left unreported at the level of athletes and assistant coaches. Rather, the harassment and sexual abuse was reported to head coaches of multiple sports, Ohio State administrators, Ohio State lead physicians and medical directors, and to the head of the Athletic Department. But these officials turned a blind eye to the abuse, perpetuating OSU's culture of indifference, and creating a heightened risk of sexual abuse for other students.

407.     Former wrestling head coach, Russell Hellickson, has publicly stated in 2018 that it was widely known that Dr. Strauss was engaging in improper sexual behavior and that he reported this behavior to higher authorities within OSU, but OSU authorities did nothing.

408.     OSU could have prevented Plaintiffs' abuse had OSU taken appropriate and reasonable action on prior complaints about Strauss's conduct.

409.     OSU created a sexually hostile culture in its athletic and student health programs, which substantially heightened the risk that Plaintiffs and others would be sexually harassed and/or assaulted.

410.     OSU has failed and continues to fail to carry out its duties to investigate and take corrective action, or to make appropriate recommendations, under Title IX following the complaints of sexual assault, as described herein.

411.     Despite the complaints and concerns conveyed by athletes and coaches to

Defendant OSU and its agents and/or representatives, as described herein, sexual abuse and misconduct allegations went unaddressed, which violated reporting policies and procedures and Title IX and was done in a manner that displayed deliberate indifference to the sexual misconduct and abuse that was occurring.

412. The sheer scale of the abuse (involving nonathletes and student athletes from at least 14 sports) multiplied by the years it went on for (nearly 20 years) makes it implausible to suggest that Defendant OSU (through its agents and/or representatives) did not know of the endemic sexual abuse.

413. The Perkins Coie Report independently confirms this and explicitly names those at OSU who were aware of the abuse throughout Strauss's twenty-year tenure.

414. The Clery Act Report released by OSU on October 1, 2019, independently confirms the magnitude of abuse.

415. OSU acted with deliberate indifference by failing to respond to the allegations of sexual assault, abuse, and molestation in light of the known circumstances, Dr. Strauss's conduct toward male athletes, and the scale of the abuse, which occurred both in private examination rooms and also publicly in the showers and training facilities by Dr. Strauss and the other sexual predators allowed to roam freely within Larkins Hall.

416. OSU failed to adequately supervise or otherwise ensure Dr. Strauss complied with Title IX and other state and federal laws even though OSU had gained actual knowledge that Dr. Strauss posed a substantial risk of additional sexual abuse of male students and student-athletes.

417. OSU's deliberate indifference before, during, and after the sexual assault, battery, molestation, and harassment of Plaintiffs was in violation of Title IX, 20 U.S.C. § 1681, et seq., and its regulations.

418. OSU's failure to implement any policies or procedures for reporting or

investigating sexual abuse until at least 2000 resulted in Plaintiffs being subject to further sexual assault, battery, molestation, harassment and a sexually hostile environment.

419.    OSU's failure to properly and appropriately investigate and take corrective action for the complaints of Dr. Strauss's and other sexual predators' sexual assault, battery, molestation, and harassment resulted in Plaintiffs being subject to further sexual assault, battery, molestation, harassment, and a sexually hostile environment.

420.    OSU's failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after receiving notice subjected Plaintiffs to further sexual assault, battery, molestation, harassment, and a sexually hostile environment, effectively denying them access to educational opportunities at OSU, including appropriate medical care.

421.    OSU's failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after receiving notice subjects Plaintiffs to harm and suffering today.

422.    In sum, OSU exhibited deliberate indifference to the rights of Plaintiffs in the following nonexclusive ways:

    a.    OSU legitimized Strauss's conduct as ordinary medical care, such as by ignoring, rebuffing, or joking about student complaints;

    b.    OSU legitimized Strauss's conduct as ordinary medical care, such as by continuing to employ and promote him, and by increasing his access to students;

    c.    Even after limiting Strauss's ability to see students in the Athletic Department and Student Health, OSU allowed Strauss to continue teaching and to open a Men's Clinic off campus that was advertised to OSU students in the school newspaper;

    d.    OSU failed to investigate or elevate numerous complaints of sexual abuse by Strauss;

    e.     OSU failed to maintain or hid records of student complaints about Strauss's abuse;

    f.     OSU failed to inform students, as well as many staff members, about Strauss's abuse until 2018;

    g.     OSU failed to investigate its own enabling of Strauss until the Perkins Report was released in 2019.

423.    Prior to the release of the Perkins Coie Report, OSU repeatedly failed to offer counseling services to current or former victims of Dr. Strauss, including Plaintiffs.

424.    As the Perkins Coie Report independently verifies, multiple appropriate persons at OSU knew of the sexual abuse of students by Richard Strauss, they were deliberately indifferent to the abuse, and Plaintiffs were sexually abused as a result of OSU's indifference. These are facts, not legal conclusions.

425.    Plaintiffs did not and could not have known of OSU's role in Strauss's abuse of them until at least 2018 or 2019. Until 2018, none of the plaintiffs had any reason to know of OSU's role in their abuse—none of them had any reason to believe that OSU knew Strauss was an abuser, and could have stopped the abuse, before they were ever his patients. All of the plaintiffs allege they had no reason to know of OSU's role in causing their harassment and abuse—and OSU's knowledge of that abuse—until 2018 (when media reports on OSU's investigation revealed rampant sexual abuse by Dr. Strauss for decades) or 2019 (when the Perkins Report confirmed and detailed OSU's knowledge of the same).

426.    As a direct and proximate result of the OSU's actions and inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self- esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be

prevented from performing daily activities and obtaining the full enjoyment of life, have sustained and continue to sustain loss of earning and loss of earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

427.     In subjecting Plaintiffs and the Class members to the wrongful treatment herein described, and through its violations of Title IX, OSU, in its effort to "save face" and avoid bad publicity, acted willfully and maliciously with the intent to harm Plaintiff and the Class members, and in conscious disregard of Plaintiff and the Class members' rights, so as to constitute malice and oppression. Plaintiff and the Class members are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against OSU, in a sum to be shown according to proof.

428.     Furthermore, Plaintiffs request the award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully requests that this Court will:

a.     Enter judgment against Defendant in such amounts as will fully and adequately compensate Plaintiffs for the damages they have suffered, in an amount to be determined at trial;

b.     Appoint Plaintiffs as class representatives;

c.     Appoint Plaintiffs' counsel as counsel for the Class;

d.     Award Plaintiffs punitive damages against Defendants in an amount to be determined by a jury for Defendant's violations of federal law;

e.     Award Plaintiffs pre-judgment and post-judgment interest;

f.     Award Plaintiffs their actual expenses of litigation, including reasonable attorney's fees;

g.     Enforce an attorneys' lien on all settlement funds recovered, pursuant to Plaintiffs' contractual agreements with undersigned counsel; and

h.     Award Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully Submitted,

/s/ *Simina Vourlis*
Simina Vourlis,
The Law Office of Simina Vourlis
856 Pullman Way
Columbus, OH 43212
(614) 487-5900
(614) 487-5901 fax
svourlis@vourlislaw.com

Rex A. Sharp
Larkin Walsh
Sarah T. Bradshaw
SHARP LAW, LLP
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax
rsharp@midwest-law.com
lwalsh@midwest-law.com
sbradshaw@midwest-law.com

Robert Allard
CORSIGLIA, MCMAHON AND ALLARD, LLP
96 North Third Street, Suite 620
San Jose, CA 95112
(408) 289-1417
(408) 289-8127 fax
rallard@cmalaw.net

Stephen Estey
ESTEY & BOMBERGER LLP
2869 India Street
San Diego, CA 92103
619-295-0035
619-295-0172 fax
steve@estey-bomberger.com

Daniel R. Karon (#0069304)
KARON LLC
700 W. St. Clair Ave., Suite 200
Cleveland, OH 44113
Tel.: 216.622.1851
dkaron@karonllc.com

**COUNSEL FOR PLAINTIFFS**